# IN THE SUPREME COURT OF IOWA

No. 08–1384

Filed December 10, 2010

**STATE OF IOWA,**

    Appellee,

vs.

**CALVIN CLARENCE NELSON, JR.,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Don C. Nickerson, Judge.

The State seeks further review of a decision of the court of appeals reversing the defendant's conviction for first-degree murder. **DECISION OF THE COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Nan Jennisch, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Kevin R. Cmelik, Assistant Attorney General, John P. Sarcone, County Attorney, and Stephanie L. Cox and James P. Ward, Assistant County Attorneys, for appellee.

**WIGGINS, Justice.**

The State seeks further review of a court of appeals decision reversing a defendant's first-degree murder conviction. A jury found the defendant guilty of first-degree murder. On appeal, the court of appeals reversed the conviction because it concluded the district court should not have admitted evidence of the defendant's drug dealing. On further review, we find the evidence is not excludable under Iowa Rule of Evidence 5.404(*b*). Therefore, we vacate the decision of the court of appeals and affirm the judgment of the district court.

**I. Background Facts and Proceedings.**

On the evening of June 26, 2007, Michael Collins and his girlfriend, Tracy Lewis, bought some crack and smoked it at a friend's house. Afterwards, Collins and Lewis left to purchase more crack. Eventually, they parked at the intersection of Seventh Street and Hickman Road in Des Moines.

Collins was willing to approach strangers to purchase crack. At approximately midnight, Collins got out of the car, took Lewis's cell phone, and told her he was going to walk to an apartment complex located at the intersection of Eighth Street and Jefferson Avenue where he had previously purchased crack. Accordingly, Collins began to walk south on Seventh Street while Lewis waited in the car. Lewis waited for approximately fifteen to twenty minutes and began to worry. Just as she was about to start the car and go looking for Collins, she heard two "pop pop" sounds. Lewis drove to the intersection of Seventh Street and Franklin Avenue and saw Collins lying in the grass.

Earlier, at approximately 11 or 11:30 p.m. the same day, Calvin Nelson Jr. and his paramour, Dody Lester, were at the Double Deuce bar. While there, Nelson received a phone call and told Lester that he

had to "go make things right with a friend of his." Nelson told Lester his friend "wanted some stuff," but all he had was gank, which is fake crack. Eventually, Nelson and Lester drove to a house located at Seventh Street and Franklin Avenue, where Nelson's friend lived. When they pulled up to the house, there were a large number of people standing in the yard. Nelson repeatedly tried to call his friend but he would not answer. While there, Lester observed a white male talking on a cell phone on the corner of Seventh Street and Franklin Avenue. The white male was Collins.

Nelson finally got in touch with his friend and told him to meet Nelson on Eighth Street. Lester parked their vehicle on Washington Avenue between Seventh and Eighth Street; Nelson got out and waited in the road for his friend to arrive. His friend never arrived, but Collins approached Nelson and the two began to converse. In response to Collins' statements, Lester heard Nelson say twice, "I don't know what you're talking about." Subsequently, Nelson got back into the vehicle with Lester, and they again headed towards Seventh Street and Franklin Avenue.

As they pulled up to Seventh Street and Franklin Avenue, Nelson saw his friend standing outside. Nelson exited the vehicle, while Lester waited inside. Nelson and the friend talked for a few minutes, and then Collins approached Nelson again. Nelson said, "Who are you, dude?" Nelson's friend then said, "I don't know who he is." Nelson pulled a gun out of his pocket and pointed it at Collins. Collins put his hands in the air and said, "I am nobody, I am nobody." Nelson then shot Collins in the face, and he fell to the ground. Collins was on all fours, trying to crawl away. Nelson walked towards Collins and shot him again in the back of the head. Lester witnessed the entire incident between Nelson and Collins. After the shooting, Nelson got back into the vehicle with

Lester and drove away. Paramedics rushed Collins to Mercy Medical Center, where he was pronounced dead.

Lester saw Nelson again later the next day. Nelson told her he did not want to kill Collins, but he thought Collins was a police officer trying to apprehend him for drugs and he had to kill Collins because Collins had seen his face. Nelson also threatened to kill Lester if she told anyone about the shooting.

At approximately 2:30 p.m. the next day, a seven-year-old boy found a gun under a rock in his backyard. The boy's mother called the police and turned the gun over to them. A firearms specialist from the Iowa Division of Criminal Investigation later confirmed the two cartridge cases found at the scene of the Collins' shooting were fired from the recovered gun. Nelson's girlfriend used to live at the duplex where the boy discovered the gun. Moreover, Nelson began calling the boy's mother numerous times the day after the shooting, urgently requesting to speak with her in person and asking if she had seen him in her backyard earlier that morning. After reporting this to the police, the mother agreed to meet Nelson at her home. When Nelson arrived, the police immediately arrested him. The State charged Nelson with the crime of murder in the first degree, in violation of Iowa Code sections 707.1 and 707.2 (2005).

Nelson filed a pro se motion in limine seeking to prohibit the testimony of narcotics officer Chad Nicolino. Nicolino's expected testimony concerned his general knowledge of crack and drug trafficking, which Nelson argued would be highly prejudicial. Nelson's counsel supplemented the pro se motion by filing an additional motion in limine. The motion sought to preclude the State from mentioning in voir dire and

opening statement or offering any evidence at trial regarding Nelson's prior criminal record as well as to prohibit the testimony of Nicolino.

In considering the motion in limine, the court stated it was more inclined to allow Nicolino to testify about specific drug trafficking in the area where the crime occurred but not about the general nature of drug trafficking due to the prejudice it would engender. However, the court decided to reserve its ruling on the motion until it heard more about the evidence in the case.

The State never called Nicolino as a witness. Instead, the State called Sergeant Chris Hardy to testify against Nelson. Before he became a detective, Hardy worked as a plainclothes undercover narcotics officer. After Hardy described his involvement in the present case, the State asked to take up a legal issue with the court outside the presence of the jury. Subsequently, the State notified the court that the police found plastic bags and marijuana in Nelson's vehicle as well as an empty cardboard box for a digital scale in Nelson's home. The State informed the court that it planned to ask Hardy whether these items were consistent with drug dealing. Nelson's counsel argued this evidence was irrelevant and an attempt by the State to improperly show Nelson's bad character. In response, the State argued this evidence corroborated Lester's testimony, explained the context in which the crime took place, and explained why the crime occurred. The court requested the State to make an offer of proof.

After the offer of proof, Nelson's counsel again argued this evidence was not relevant. The court refused to allow Hardy to testify about the marijuana. As for the plastic bags and the empty cardboard digital scale box, the court ruled, "To the extent that the paraphernalia found in the van [and home] could be used in connection with crack sales, I will allow

that testimony." Hardy then testified that, based on his experience as an undercover narcotics officer, he was knowledgeable about the items consistently found with crack dealers. Hardy testified plastic bags are consistent with crack sales. He stated that after the crack is weighed, it is placed inside a plastic bag, and a knot is tied so the crack can be kept in a person's pocket or mouth without dissolving. Hardy also testified crack dealers commonly use a gram or digital scale to weigh the drugs before they sell them.

The State also called identification technician Nancy Lamasters, who searched Nelson's vehicle pursuant to a search warrant. Through Lamasters, the State introduced pictures of the plastic bags and the plastic bags themselves into evidence. After each offer to introduce the pictures and plastic bags into evidence, Nelson's counsel renewed his previous relevance objection. In addition, the State called officer Jason Halifax, who assisted in the execution of a search warrant at Nelson's residence. Through Halifax, the State introduced pictures of the empty cardboard digital scale box and the box itself into evidence. After each offer to introduce the pictures and the box into evidence, Nelson's counsel again renewed his previous relevance objection.

The jury returned a verdict finding Nelson guilty of first-degree murder. Nelson filed a notice of appeal, and we transferred the case to the court of appeals. Considering Iowa Rule of Evidence 5.404(*b*), the court of appeals concluded the evidence linking Nelson to drug dealing was marginally relevant to complete the story of the crime but not relevant to Nelson's motive or intent because these elements could be inferred from Nelson's use of a deadly weapon to commit the crime. Although determining the evidence was marginally relevant to complete the story of the crime, the court of appeals concluded this evidence

primarily served to paint Nelson as a bad person. Therefore, the court of appeals concluded the evidence's probative value was far outweighed by its prejudicial effect. Consequently, the court of appeals held the admission of the drug-dealing evidence was not harmless error, reversed the judgment of the district court, and remanded the case for a new trial. Subsequently, the State sought further review, which we granted.

## II. Issue.

The issue we must decide on this further review is whether the admitted testimony of a narcotics officer detailing the sale and distribution of crack as well as the evidence of the plastic bags and the empty digital scale box, which the officer explained are consistently found with crack-drug dealers, requires us to reverse Nelson's conviction.

## III. Scope of Review.

We review evidentiary rulings for an abuse of discretion. *State v. Stone*, 764 N.W.2d 545, 548 (Iowa 2009). When a trial court admits evidence on grounds or for reasons clearly untenable or to an extent clearly unreasonable, the court has abused its discretion. *State v. Maghee*, 573 N.W.2d 1, 5 (Iowa 1997). When the trial court makes a ruling based on an erroneous application of the law, its ruling is clearly untenable. *In re J.A.L.*, 694 N.W.2d 748, 751 (Iowa 2005).

## IV. Analysis.

**A. Admissibility as Intrinsic Evidence that Completes the Story of the Crime.** At trial, the State claimed it was not offering the testimony of the narcotics officer and the introduction of the plastic bags and empty scale box as character evidence. Rather, it sought to admit this evidence to give the jury the complete story of the crime and show Collins was in the area to purchase drugs. It was on this basis that the

court admitted the testimony of the narcotics officer and permitted the introduction of the plastic bags and empty scale box into evidence.

1. *The inextricably intertwined doctrine.* Not all evidence of other crimes, wrongs, or acts falls within the scope of rule 5.404(*b*). One category of other crimes, wrongs, or acts evidence not covered by rule 5.404(*b*) is evidence deemed inextricably intertwined with the crime charged.[1] *See, e.g., United States v. Bowie,* 232 F.3d 923, 927 (D.C. Cir. 2000); *State v. Walters,* 426 N.W.2d 136, 140–41 (Iowa 1988). "Inextricably intertwined evidence is evidence of the surrounding circumstances of the crime in a causal, temporal, or spatial sense, incidentally revealing additional, but uncharged, criminal activity." Jennifer Y. Schuster, *Uncharged Misconduct Under Rule 404(b): The Admissibility of Inextricably Intertwined Evidence,* 42 U. Miami L. Rev. 947, 973 (1988) [hereinafter *Schuster*]; *see also State v. Garren,* 220 N.W.2d 898, 900 (Iowa 1974) (citing Iowa law dating back to 1915 that repeatedly recognized "events and circumstances which immediately surround an offense may be shown even though they may incidentally show commission of another crime"). The inextricably intertwined doctrine bypasses rule 5.404(*b*) because rule 5.404(*b*), by its express terms, is only applicable to evidence of *other* crimes, wrongs, or acts, which is considered to be extrinsic evidence. Edward J. Imwinkelried,

---

[1]The inextricably intertwined doctrine developed in the federal circuit courts in relation to Federal Rule of Evidence 404(b). However, since its conception, it has gained widespread acceptance in every federal circuit court as well as among the states. Edward J. Imwinkelried, *The Second Coming of Res Gestae: A Procedural Approach to Untangling the "Inextricably Intertwined" Theory for Admitting Evidence of an Accused's Uncharged Misconduct,* 59 Cath. U. L. Rev. 719, 723 (2010). Moreover, we have recognized that Iowa Rule of Evidence 5.404(*b*) is "similar" and "the counterpart to" Federal Rule of Evidence 404(b). *State v. Cox,* 781 N.W.2d 757, 762 (Iowa 2010); *State v. Sullivan,* 679 N.W.2d 19, 23 (Iowa 2004). Thus, for purposes of this opinion, we will generally refer to Iowa Rule of Evidence 5.404(*b*) when discussing the inextricably intertwined doctrine.

*The Second Coming of Res Gestae: A Procedural Approach to Untangling the "Inextricably Intertwined" Theory for Admitting Evidence of an Accused's Uncharged Misconduct*, 59 Cath. U. L. Rev. 719, 724–25 (2010) [hereinafter *Imwinkelried*].

The inextricably intertwined doctrine holds other crimes, wrongs, or acts evidence that is inextricably intertwined with the crime charged is not extrinsic evidence but, rather, intrinsic evidence that is inseparable from the crime charged. *Bowie*, 232 F.3d at 927; Jason M. Brauser, *Intrinsic or Extrinsic?: The Confusing Distinction Between Inextricably Intertwined Evidence and Other Crimes Evidence Under Rule 404(b)*, 88 Nw. U. L. Rev. 1582, 1584–85 (1994) [hereinafter *Brauser*]; *Imwinkelried*, 59 Cath. U. L. Rev. at 722, 724–25. Therefore, although there are two separate offenses, the testimony about the two offenses is so closely intertwined and indivisible that the court must admit the evidence of the technically uncharged crime. *Imwinkelried*, 59 Cath. U. L. Rev. at 725. Furthermore, because rule 5.404(*b*) is inapplicable to inextricably intertwined evidence, the court admits the technically uncharged-crime evidence without limitation and irrespective of its unfair prejudice or its bearing on the defendant's bad character. *Brauser*, 88 Nw. U. L. Rev. at 1585; Milton Hirsch, *"This New-Born Babe an Infant Hercules": The Doctrine of "Inextricably Intertwined" Evidence in Florida's Drug Wars*, 25 Nova L. Rev. 279, 289–90 (2000) [hereinafter *Hirsch*]. Instead, the inextricably intertwined evidence is subject to the same general admissibility requirements as other evidence that is used to provide the fact finder with a complete picture of the charged crime. *Schuster*, 42 U. Miami L. Rev. at 973.

In summary, the inextricably intertwined doctrine permits the admission of other crimes, wrongs, or acts evidence based on a special

relationship between this evidence and the charged crime, regardless of the strictures of rule 5.404(*b*). *Imwinkelried*, 59 Cath. U. L. Rev. at 725–26.

2. *History and criticism of the inextricably intertwined doctrine.* The inextricably intertwined doctrine grew out of the inseparable crimes exception. *Brauser*, 88 Nw. U. L. Rev. at 1600. Common law courts generally refused to admit evidence of other crimes, wrongs, or acts because they viewed such evidence as irrelevant and unfair. *Hirsch*, 25 Nova L. Rev. at 281–82. The common law, however, made certain exceptions to this general rule, including the "inseparable crimes" exception. *Brauser*, 88 Nw. U. L. Rev. at 1594. "This exception was invoked [and evidence of an uncharged crime was admitted] whenever a court found that the charged crime could not be proved without mention of another [uncharged] crime." *Id.* at 1594–95. From this exception, courts began to develop a doctrine

> that evidence of uncharged misconduct was admissible when it was "so [closely] blended or connected with the one on trial . . . that proof of one incidentally involves the other; or explains the circumstances thereof." This exception broadened the class of admissible other crimes evidence by permitting not only the introduction of uncharged misconduct evidence when it was impossible to prove the crime charged without revealing the uncharged misconduct, but also when the uncharged misconduct evidence explained the circumstances surrounding the charged crime.

*Schuster*, 42 U. Miami L. Rev. at 955 (quoting *Bracey v. United States*, 142 F.2d 85, 88 (D.C. Cir. 1944)). Courts began to refer to other crimes, wrongs, or acts evidence that explained the circumstances of the crime charged, or was necessarily revealed in proving the crime charged, as res gestae. *Id.* at 955–56. Thus, the inseparable crimes exception was enlarged by the courts when they began to use the amorphous phrase

res gestae. *Brauser*, 88 Nw. U. L. Rev. at 1600. "The courts developed the res gestae or 'completes the story' doctrine in order to ensure that otherwise relevant evidence would not be excluded when it incidentally involved uncharged criminal activity . . . ." *Schuster*, 42 U. Miami L. Rev. at 971.

Shortly after the passage of Federal Rule of Evidence 404(b), courts began to characterize certain other crimes, wrongs, or acts evidence as inextricably intertwined with the crime charged in order to avoid the limitations of rule 404(b). *Id.* at 970–71. "The inextricably intertwined doctrine is arguably the second coming of the common-law *res gestae* principle." *Imwinkelried*, 59 Cath. U. L. Rev. at 728–29 (arguing the inextricably intertwined doctrine is the "modern de-Latinized" equivalent of res gestae). As one commentator has explained:

> Inextricably intertwined evidence stands in a different relationship to the crime charged than does evidence of wholly independent crimes. The inextricably intertwined evidence is causally, temporally, or spatially connected to the crime charged, and the crime charged and the uncharged acts both involved the defendant. The uncharged misconduct evidence is not offered to prove the defendant's character in order to imply that it was more likely that the defendant committed the crime charged, although in some cases an exact independent theory of relevance may be difficult, if not impossible, to articulate. Rather, the evidence is introduced to facilitate the jury's understanding of the context within which the charged crime occurred, because without this contextual setting the jury would be forced to reach a verdict in a vacuum.

*Schuster*, 42 U. Miami L. Rev. at 971–72. The federal appellate courts have attempted to define the vague term "inextricably intertwined" in various ways. *Compare United States v. Ramirez*, 45 F.3d 1096, 1102 (7th Cir. 1995), *with United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). Moreover, at least one commentator has discovered five broad

categories of other crimes, wrongs, or acts evidence, which has been found admissible under the federal inextricably intertwined doctrine. *See Schuster*, 42 U. Miami L. Rev. at 961–62. These five categories include: (1) uncharged misconduct that was a "necessary preliminary step toward completing the crime charged," (2) uncharged misconduct that is "directly probative of the crime charged," (3) uncharged misconduct that arises from the "same transaction or transactions as the crime charged," (4) uncharged misconduct that forms "an integral part of a particular witness' testimony concerning the crime charged," and (5) uncharged misconduct that "*complete[s] the story of the crime charged.*" *Id.* at 962 (emphasis added).

Although Iowa has never referred to other crimes, wrongs, or acts evidence as inextricably intertwined, we have long recognized the rule that, "[w]hen acts are so closely related in time and place and so intimately connected that they form a continuous transaction, the whole transaction may be shown *to complete the story of what happened* [even though they may incidentally show the commission of another uncharged crime]." *State v. Oppelt*, 329 N.W.2d 17, 19 (Iowa 1983) (emphasis added); *accord Walters*, 426 N.W.2d at 140–41; *State v. Hood*, 346 N.W.2d 481, 483–84 (Iowa 1984); *State v. Nowlin*, 244 N.W.2d 596, 601 (Iowa 1976); *State v. Fryer*, 243 N.W.2d 1, 6 (Iowa 1976); *Garren*, 220 N.W.2d at 900; *State v. Drake*, 219 N.W.2d 492, 494 (Iowa 1974); *State v. Lyons*, 210 N.W.2d 543, 546–47 (Iowa 1973); *State v. Wright*, 203 N.W.2d 247, 251 (Iowa 1972); *State v. Holoubek*, 246 Iowa 109, 112–13, 66 N.W.2d 861, 863 (1954); *State v. Robinson*, 170 Iowa 267, 276, 152 N.W. 590, 593 (1915). Although Iowa courts have variably referenced the inseparable crimes, res gestae, and complete the story doctrines in support of this rule, these three doctrines really consist of one evolving

principle. *See, e.g., State v. Bowers*, 656 N.W.2d 349, 354 (Iowa 2002) (reciting the inextricably intertwined test and citing federal eighth circuit cases for support); *Oppelt*, 329 N.W.2d at 19 (referencing the inseparable crimes doctrine when concluding the trial court did not abuse its discretion by admitting other crimes, wrongs, or acts evidence); *Fryer*, 243 N.W.2d at 6 (admitting uncharged evidence of a rape to complete the story of multiple charged homicides); *Lyons*, 210 N.W.2d at 545–47 (allowing res gestae evidence to help describe what actually happened at the time of the commission of the charged crime, even though it was not directly relevant to the elements of the charged crime). Accordingly, we appear to follow the inextricably intertwined doctrine. However, because most of our cases applying the doctrine simply recite the doctrine, the applicability and scope of the doctrine under our case law has never been well-defined.

Although the inextricably intertwined doctrine has gained widespread acceptance, it has also become the target of intense scholarly criticism. *Imwinkelried*, 59 Cath. U. L. Rev. at 723. This doctrine has been criticized for two principal reasons. *Id.* at 728. First, the phrasing "inextricably intertwined" is extremely vague and amorphous. *Id.* at 728–30. Critics argue this vagueness has allowed courts to engage in result-oriented decision-making and invites abuse. *Id.* at 729–30 (stating courts can justify the admission of other crimes, wrongs, or acts evidence by the simple expedient of describing it as inextricably intertwined with the charged offense). Second, critics claim courts have abused the doctrine by applying it in an overly broad manner. *Id.* at 730. "In case after case, the courts have invoked the doctrine even though, on careful scrutiny, the testimony about the charged and uncharged offenses could readily have been separated." *Id.*

Of all the different categories of inextricably intertwined evidence, none has received as harsh criticism as evidence found to be admissible because it completes the story of the crime charged. *See, e.g., Brauser*, 88 Nw. U. L. Rev. at 1606; *Hirsch*, 25 Nova L. Rev. at 300–05. Evidence that completes the story of the crime charged is admissible under the inextricably intertwined doctrine simply to put the crime charged into context, provide background, and generally explain or set up the charged crime. *Brauser*, 88 Nw. U. L. Rev. at 1606; *Hirsch*, 25 Nova L. Rev. at 300; *see also Old Chief v. United States*, 519 U.S. 172, 187–89, 117 S. Ct. 644, 653–54, 136 L. Ed. 2d 574, 592–93 (1997) (recognizing the importance of telling a "colorful story with descriptive richness" when presenting evidence to prove a crime). Thus, to complete the story of the crime, the other crimes, wrongs, or acts evidence need only pertain, in some fashion, to the chain of events explaining the context, background, or set-up of the crime charged. *Hirsch*, 25 Nova L. Rev. at 300. Critics argue almost any uncharged conduct could meet this lax test. *Brauser*, 88 Nw. U. L. Rev. at 1606 ("Under the 'completing the story' doctrine, almost any uncharged misconduct is admissible if it somehow explains how the charged crime occurred."); *Hirsch*, 25 Nova L. Rev. at 300 ("Is it possible to imagine any evidence so evanescent in any given case as not to pass this test?"). Moreover, at least one commentator has warned that this category of inextricably intertwined evidence poses the greatest threat of eviscerating rule 5.404(*b*) and has led to the admission of other crimes, wrongs, or acts evidence that is neither closely related to the charged crime nor necessary to prove it. *Brauser*, 88 Nw. U. L. Rev. at 1606.

3. *Application of the inextricably intertwined doctrine in Iowa.* Critics of the inextricably intertwined doctrine argue the doctrine must

be narrowed and toughened to ensure prejudicial other crimes, wrongs, or acts evidence that is severable from the crime charged is excluded. *See, e.g., Hirsch*, 25 Nova L. Rev. at 312–15; *Imwinkelried*, 59 Cath. U. L. Rev. at 737–41. These commentators argue the court should only admit evidence of uncharged conduct under the inextricably intertwined doctrine when the evidence cannot be severed from the narrative of the charged crime without leaving the narrative unintelligible, incomprehensible, confusing, or misleading. *Hirsch*, 25 Nova L. Rev. at 312–15; *Imwinkelried*, 59 Cath. U. L. Rev. at 737–41. Accordingly, these commentators urge, " 'Inextricably intertwined' evidence should be received infrequently, as a narrow exception to the general rule against the admission of evidence of uncharged crimes." *Hirsch*, 25 Nova L. Rev. at 313. We agree the inextricably intertwined doctrine should be used infrequently and as a narrow exception to the general rule against admitting evidence of other crimes, wrongs, or acts.

To ensure a court does not admit unnecessary and prejudicial evidence of other crimes, wrongs, or acts, we reaffirm the language from one of our earlier cases and hold we will only allow such evidence to complete the story of what happened when the other crimes, wrongs, or acts evidence is so closely related in time and place and so intimately connected to the crime charged that it forms a continuous transaction. *Oppelt*, 329 N.W.2d at 19. Thus, the charged and uncharged crimes, wrongs, or acts must form a continuous transaction. *Id.* Moreover, we will only allow the admission of other crimes, wrongs, or acts evidence to complete the story of the charged crime when a court cannot sever this evidence from the narrative of the charged crime without leaving the narrative unintelligible, incomprehensible, confusing, or misleading. In this way, we can be sure rule 5.404(*b*) remains the standard for the

admission of evidence of other crimes, wrongs, or acts and the inextricably intertwined doctrine is construed as a narrow and limited exception to rule 5.404(*b*). Therefore, under this narrow interpretation of Iowa's inextricably intertwined doctrine that completes the story of the crime, we must analyze the State's argument that the evidence the defendant was a drug dealer is not evidence of other crimes, wrongs, or acts but is, in fact, intrinsic evidence completing the story of the charged crime of murder in the first degree.

It is clear that omitting evidence of the plastic bags, empty digital scale box, and the testimony linking these items to crack-drug dealing would not have left the narrative of this crime unintelligible, incomprehensible, confusing, or misleading. The State argues the story of the murder cannot be intelligibly told without explaining why Nelson would shoot someone who merely approached him and asked him for drugs. However, Lester had already testified that Nelson was in the area where the murder occurred because "somebody wanted some stuff." Lester also testified Nelson told her the day after the murder that he killed Collins because he thought Collins was a police officer trying to apprehend him for selling drugs and because Collins had seen his face. The evidence of the plastic bags, empty digital scale box, and testimony linking these items to drug dealing simply permitted the jury to make the general inference that Nelson was involved in drug trafficking. This evidence did not fill in any gaping holes in the narrative of the story of the crime. Additionally, these items were not so closely related in time and place and so intimately connected to the charged crime that they formed a continuous transaction.

At most, the plastic bags, empty digital scale box, and testimony linking these items to drug dealing support the State's proposed motive

for the killing—Nelson was a drug dealer who believed Collins was an undercover narcotics officer attempting to apprehend him for selling crack, and he decided to kill Collins because Collins had seen his face. If this evidence was offered for the noncharacter purpose of establishing motive, it must be subjected to a rule 5.404(*b*) analysis. Accordingly, we hold the evidence of the plastic bags, the empty digital scale box, and the testimony linking these items to crack-drug dealing was not admissible as inextricably intertwined evidence offered to complete the story of the crime.

**B. Admissibility Under Rule 5.404(*b*).** At trial, the State did not claim the plastic bags, the empty digital scale box, and the testimony linking these items to crack-drug dealing was admissible under Iowa Rule of Evidence 5.404(*b*). On appeal, the State claims for the first time the evidence is admissible under rule 5.404(*b*). Normally, we would not reach this claim because the State failed to preserve error by not arguing this evidence is admissible under rule 5.404(*b*) in the trial court. *DeVoss v. State*, 648 N.W.2d 56, 60–61 (Iowa 2002). However, we have adopted an exception to the general rule of error preservation when dealing with evidentiary rulings. *Id.* at 62–63. Therefore, we will address the State's claim regarding the admissibility of this evidence under rule 5.404(*b*).

1. *General legal principles concerning rule 5.404(b).* Iowa Rule of Evidence 5.404(*b*) governs the admissibility of evidence of other crimes, wrongs, or acts. It provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Iowa R. Evid. 5.404(*b*). Rule 5.404(*b*) is a rule of exclusion. *State v. Sullivan,* 679 N.W.2d 19, 24 (Iowa 2004). The public policy for excluding other crimes, wrongs, or acts evidence is not that the evidence is irrelevant. *Id.* Rather, the public policy for excluding such evidence is based on the premise that a jury will tend to give other crimes, wrongs, or acts evidence excessive weight and the belief that a jury should not convict a person based on his or her previous misdeeds. *Id.*

Other crimes, wrongs, or acts evidence cannot be used to show the defendant has a criminal disposition and, therefore, was more likely to have committed the crime in question. *State v. Reynolds*, 765 N.W.2d 283, 289 (Iowa 2009). However, other crimes, wrongs, or acts evidence is admissible if it is probative of some fact or element in issue other than the defendant's general criminal disposition. *State v. Taylor*, 689 N.W.2d 116, 123 (Iowa 2004). Rule 5.404(*b*) lists several examples of when prior conduct can be probative of some fact or element in issue other than the defendant's general criminal disposition. The examples included in rule 5.404(*b*) are "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Iowa R. Evid. 5.404(*b*). The examples listed in rule 5.404(*b*) are not exclusive; rather, "[t]he important question is whether the disputed evidence is 'relevant and material to some legitimate issue other than a general propensity to commit wrongful acts.' " *State v. Mitchell*, 633 N.W.2d 295, 298 (Iowa 2001) (quoting *State v. Barrett*, 401 N.W.2d 184, 187 (Iowa 1987)).

To be admissible, the prosecutor must articulate a noncharacter theory of relevance. *Sullivan*, 679 N.W.2d at 28. The court then must determine whether the other crimes, wrongs, or acts evidence is relevant and material to a legitimate issue in the case, other than a general propensity to commit wrongful acts. *State v. Cox*, 781 N.W.2d 757, 761

(Iowa 2010). If the court determines the evidence is relevant to a legitimate issue in dispute, the court must determine whether the probative value of the other crimes, wrongs, or acts evidence is substantially outweighed by the danger of unfair prejudice to the defendant. *Id.* In determining whether the probative value of other crimes, wrongs, or acts evidence is substantially outweighed by the danger of unfair prejudice, the court should consider

> the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*Taylor*, 689 N.W.2d at 124. If the evidence's probative value is substantially outweighed by its unfair prejudice, it must be excluded. *Mitchell*, 633 N.W.2d at 298–99.

2. *Application of rule 5.404(b).* The State articulates a noncharacter theory of relevance—the evidence of drug dealing is probative to motive and intent. To the extent the challenged evidence tends to support the general inference that Nelson is a crack-drug dealer, it is relevant to the issues of Nelson's motive and intent for killing Collins. The evidence of drug dealing is relevant to motive because a drug dealer would be more inclined to shoot an individual seeking to purchase crack if they believed the person was an undercover narcotics officer. Motive can be relevant to whether a defendant acted with malice aforethought. *See State v. Hoffer*, 383 N.W.2d 543, 549 (Iowa 1986) ("Although motive is not a necessary element of murder, lack of motive may be considered in determining whether an assailant acted with malice aforethought."). Additionally, the evidence is also relevant to

intent because a drug dealer would be more inclined to intentionally kill an undercover narcotics officer who could later identify and apprehend him or her. Thus, the challenged evidence is relevant to the legitimate issues of Nelson's motive and intent.

The State next claims the probative value of the drug-dealing evidence is not substantially outweighed by the danger of unfair prejudice to Nelson. We agree, the evidence of drug dealing is not substantially outweighed by the danger of unfair prejudice to Nelson.

The record contains sufficient evidence to establish Nelson sold drugs and was in the area on the night in question to engage in a drug deal. Although, the court instructed the jury that it could infer malice aforethought and intent from Nelson's use of a dangerous weapon, the jury was free to accept or reject that inference. On the other hand, the challenged evidence of drug dealing is direct evidence supporting the conclusion that Nelson intentionally and with malice aforethought killed Collins because Nelson thought Collins was an undercover police officer who saw Nelson's face. The State needed this type of evidence to prove its case.

Finally, we doubt the jury decided the case on the basis Nelson was a drug dealer. Lester witnessed the shooting. The next day, Nelson told Lester he shot Collins because Collins saw his face and he thought Collins was a police officer. A child found the murder weapon in the yard of a duplex where Nelson's prior girlfriend used to live. Nelson repeatedly made contact with the child's mother, inquiring whether she had seen him in the yard. The evidence was replete with testimony regarding drug dealing in the area where the charged crime took place. In light of all this evidence, the mere fact Nelson was a drug dealer does not lead us to believe the jury decided the case on that basis.

Therefore, the plastic bags, the empty digital scale box, and the testimony linking these items to drug dealing were not excludable under rule 5.404(*b*).

### V. Disposition.

We vacate the decision of the court of appeals and affirm the judgment of the district court because the plastic bags, the empty digital scale box, and the testimony linking these items to drug dealing were not excludable under rule 5.404(*b*).

**DECISION OF THE COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**