# IN THE COURT OF APPEALS OF IOWA

No. 21-1476
Filed June 7, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**CHARLIE GARY III,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Mark Fowler, Judge.

Charlie Gary III appeals his first-degree murder conviction. **AFFIRMED.**

Karmen Anderson, Des Moines, for appellant.

Brenna Bird, Attorney General, and Kyle Hanson, Assistant Attorney General, for appellee.

Considered by Bower, C.J., and Tabor and Greer, JJ.

**BOWER, Chief Judge.**

Charlie Gary III was convicted after a jury trial of first-degree murder, first-degree burglary, first-degree robbery, and abuse of a corpse. On appeal, he challenges the sufficiency of the evidence of malice aforethought to support his first-degree murder conviction.[1] Because there is substantial evidence from which the jury could find malice aforethought, we affirm.

On January 7, 2020, seventy-four-year-old Robert Long was found strangled in his home. Long's body was leaning over the living room couch with his pants around his ankles. There were ligature marks on his neck, and a red elastic exercise band was found nearby. His hands were by his neck and his fingers were clenched. There was dried blood and severe swelling to his rectal area.

The home had been ransacked. Items were knocked over in the hallway and living room. The bedroom drawers had been rifled through, money bags were strewn on the floor, and a briefcase and lockbox were pried open.[2] Family members noticed a TV, camera, change jar, cash, and Long's cell phone were all missing. His blue Ford Taurus was not in the driveway.

---

[1] Gary also asserts the prosecutor engaged in misconduct. He concedes no objection was made to preserve his claims of prosecutorial misconduct. We decline his invitation to bypass error-preservation and we do not address his prosecutorial misconduct claims further. *See State v. Smith*, No. 18-2052, 2020 WL 376554, at *4 (Iowa Ct. App. Jan. 23, 2020) (finding error was not preserved because "defendant waives his right to complain of prosecutorial misconduct if a motion is not made 'before submission to the jury'" (citation omitted)). *Cf. State v. Nelson*, 234 N.W.2d 368, 371 (Iowa 1975) ("[O]bjections to remarks of counsel during final jury argument are timely if urged at close of argument and in a motion for mistrial made before submission to the jury.").

[2] Long ran a business out of his home and kept cash for his business and an emergency fund there.

A subsequent investigation pointed to Gary, who had previously been paid to do chores for Long. On January 3, 2020, Gary had a fight with his mother about finances. It was snowing, so he went to Long's house hoping to earn some money shoveling. At about 10:47 p.m., surveillance video showed Gary leaving his uncle's house, which was less than half a mile from Long's house.

On January 4, Long's phone was used to log into Gary's Facebook account. Gary sent Facebook messages to a friend about plans to take a cell phone to "that phone machine at Walmart." Matching browser history showed a search for EcoATM, which is a machine where people can trade cell phones for cash. Gary also sent Facebook messages to friends bragging that he had a new car. Location data indicated the phone was in the vicinity of Gary's house.

About 10 a.m. on January 4, Gary and his mother pawned Long's television at EZ Pawn. Surveillance video showed Gary driving Long's stolen car. A couple days later, Gary and his uncle pawned Long's cell phone at EZ Pawn. Surveillance video again showed Gary driving Long's stolen car.

After midnight on January 8, police spotted Long's stolen car with two people inside. When an officer began to follow in a marked squad car, the stolen car sped up and made evasive moves. The car stopped momentarily for the passenger—Gary's mother—to get out. The stolen vehicle sped away, crashed into a utility pole, and then was left abandoned. Police caught Gary nearby and identified him as the driver. They found Gary's cell phone in the center console.

In an interview, Gary gave several stories to detectives about how he came to have the stolen Taurus. First, he said he found a key from a Taurus in a junkyard that just happened to work on the stolen vehicle, which he found on the street.

Gary was confronted about his mom pawning a TV. Gary said the TV came from his uncle's house and he claimed he did not know the owner of the car and had never been to the owner's house. He changed his story a few minutes later, saying he picked a random house, knocked, and pushed in the door when a man answered. He took the car keys as the man lay on the floor. After first denying going through any drawers, he admitted opening drawers and finding an empty cashbox. He denied taking the TV, cell phone, or anything except the car keys. Gary denied fighting with the man; he claimed the man was knocked out and lying face down by the door.

Gary changed his story again. He admitted he knew the victim and had been working at his home since the previous summer. Gary said he went there that night because it was snowing and he offered to shovel the driveway. Gary said he left the man lying unconscious on the floor.

Still later, Gary explained he was angry about an argument with his mother and he "took it out" on the victim. When detectives asked if the autopsy would indicate strangulation, Gary admitted he strangled the man. The detective asked if the ligature was a belt or shoelace, but Gary said he used a "something stretchy" that he found in the living room. He described wrapping the stretchy band around the victim's neck and strangling him in the hallway because he was angry. Gary admitted he stole the TV and pawned it with his mother. Gary still insisted the victim remained fully clothed and that he did not assault the victim in any other way.

Later in the interview Gary said, "I strangled him and then I raped him." Gary explained he dragged Long into the living room, strangled him on the couch,

and then raped him after he finished strangling him. He denied being gay and the detective's suggestion that some older men like to take advantage of younger men who need money. Gary said his decision to rape the man was "just spur of the moment" and "something new, I guess."

Police later executed a search warrant at Gary's home, and in his bedroom they found Long's stolen laptop computer.

An autopsy confirmed Long died of ligature strangulation. The ligature marks on his neck were consistent with being caused by a knot in the red elastic exercise band found at the scene. Long also had petechial hemorrhages in both eyes, indicative of strangulation. The medical examiner explained at trial that ligature strangulation causes death by cutting off blood flow to the brain; a person loses consciousness in ten to fifteen seconds, but "that force has to be applied for another few minutes before you suffer brain death."

The autopsy also indicated Long had blunt-force injuries to his jaw and scalp, several scrapes and a bruise on his abdomen, and scrapes and bruises on his shoulder, wrist, right thigh, and left leg. Long's anus showed dark bruising, which is evidence of trauma. The medical examiner collected an anal swab as part of sexual assault kit. The anal swab screened positive for seminal fluid and contained spermatozoa. The profile from the sperm fraction of the anal swab contained a mixture of DNA from two people, the major contributor was a 1-in-10-nonillion match to defendant Gary.[3]

---

[3] The minor contributor was too weak for identification. The expert explained "we would expect somebody's own DNA to be in their own anus."

The jury was instructed that to find Gary guilty of first-degree murder the State was required to prove beyond a reasonable doubt that Gary strangled Long, Long died as a result of being strangled, Gary acted with malice aforethought, and he was participating in first-degree burglary or first-degree robbery.

The jury found Gary guilty of murder in the first degree, burglary in the first degree, robbery in the first degree, and abuse of a corpse. On appeal, Gary claims there is insufficient evidence of malice aforethought to sustain his first-degree murder conviction.

We review challenges to the sufficiency of the evidence for correction of errors at law. *See State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). A verdict will be upheld if substantial evidence supports it. *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018). "Evidence is substantial if, 'when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.'" *Id.* (citation omitted). "Evidence is not insubstantial just because it might support a different conclusion; the only question is whether the evidence supports the finding actually made." *State v. Koromah*, No. 21-1606, 2023 WL 3092501, at *3–4 (Iowa Ct. App. Apr. 26, 2023) (finding substantial evidence of malice aforethought where the defendant appeared to aim at victim and fired more than one shot and the inferences arising from his actions after the shooting and shifting stories to police about what happened).

The jury was instructed, "'Malice' is a state of mind which leads one to intentionally do a wrongful act to the injury of another or in disregard of the rights of another out of actual hatred, or with an evil or unlawful purpose." *Accord State v. Green*, 896 N.W.2d 770, 779 (Iowa 2017) (defining malice as "that condition of

mind which prompts one to do a wrongful act intentionally, without legal justification or excuse" (citation omitted)).

"Malice aforethought" was defined to the jury as "a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time." Malice aforethought "may be found from the acts and conduct of the defendant, as well as the means used to do the wrongful and injurious act." *State v. Kinsel*, 545 N.W.2d 885, 888 (Iowa Ct. App. 1996).

The jury was also instructed, "If a person has the opportunity to deliberate and uses a dangerous weapon against another resulting in death, you may, but are not required to infer that the weapon was used with malice," and "Malice aforethought may be inferred from the defendant's use of a dangerous weapon." *Accord State v. LuCore*, 989 N.W.2d 209, 217 (Iowa Ct. App. 2023). A dangerous weapon was defined, in part, as "any sort of instrument or device which is used in such a way as to indicate the user intended to inflict death or serious injury, and when so used is capable of inflicting death." On our review, we conclude there is substantial evidence to support the jury finding of malice aforethought.

Gary admitted he went to Long's house in search of money. *See State v. Nelson*, 791 N.W.2d 414, 426 (Iowa 2010) ("Motive can be relevant to whether a defendant acted with malice aforethought."). Gary admitted he strangled Long because he was angry, which supports a finding that he acted with a fixed purpose to do physical harm. *See State v. Ayers*, No. 01-0365, 2002 WL 985007, at *2 (Iowa Ct. App. May 15, 2002) ("We have previously considered evidence of a defendant's anger when assessing the sufficiency of evidence supporting a finding

of malice aforethought.").  The fact that asphyxiation takes several minutes is also evidence that supports a finding that he acted with a fixed purpose to do harm, as is the evidence of all the other injuries inflicted on Long—blunt force injuries to the jaw and scalp; bruises on the abdomen, shoulder, wrist, thigh, and leg; and the trauma to the anus.  Viewing the evidence in the light most favorable to the State, we are convinced that a rational factfinder could find Gary guilty of first-degree murder beyond a reasonable doubt.  We affirm.

**AFFIRMED.**