# IN THE COURT OF APPEALS OF IOWA

No. 22-1157
Filed January 10, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ROBERT LEROY PETERSON JR.,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Linn County, Justin Lightfoot, Judge.

Robert Peterson appeals from his conviction and sentence for arson in the second degree. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Ashley Stewart, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Thomas J. Ogden, Assistant Attorney General, for appellee.

Considered by Tabor, P.J., Badding, J., and Vogel, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**VOGEL, Senior Judge.**

Robert Peterson appeals from his conviction and sentence for arson in the second degree. He argues the district court improperly admitted opinion testimony and bad-acts evidence and the court abused its discretion in sentencing him to a ten-year term of incarceration. We find the court acted within its discretion in admitting all challenged evidence and imposing the sentence, and we affirm.

I.      **Background Facts and Proceedings**

As of October 17, 2020, Peterson and his wife, Ronnee O'Brien, lived together in a house in Cedar Rapids. According to O'Brien's testimony, she returned home from work shortly after midnight on this date. Their "marriage was in trouble" at this point due to Peterson's alcohol use, so she typically slept in an upstairs bedroom while Peterson slept in the basement. Peterson was waiting for her when she entered the house, and he was "belligerently drunk" and often unintelligible. "[A]fter listening to him berate" her for some time and briefly laying down on the downstairs bed, she fled the home to spend the night at her adult son's home.

Exterior security video shows O'Brien leaving her home shortly after 1:30 that morning, followed by Peterson leaving the home around 2:50 a.m. At 2:56 a.m., the video first shows smoke pushing out of the base of the home, which grows into a fire and dies out around 5:40 a.m. The video shows Peterson returning to the damaged home around 6:10 a.m. O'Brien testified the home was so heavily damaged in the fire that it had to be demolished and she was unable to recover any of her personal property.

Peterson was charged with arson in the second degree. He proceeded to a five-day trial in March and April 2022, after which the jury found him guilty as charged. The court sentenced him to a term of incarceration not to exceed ten years. He now appeals.

## II.      Standard of Review

We generally review evidentiary rulings for an abuse of discretion. *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015). We also review a sentence for abuse of discretion when the sentence is within the bounds of the constitution and the Iowa Code. *State v. Headley*, 926 N.W.2d 545, 549 (Iowa 2019).

## III.      Analysis

To convict Peterson of arson in the second degree, the marshalling instruction required the State to prove he caused a fire in or near certain property on or around October 17, 2020, and he "acted with the specific intent to destroy or damage such property" or "acted with the knowledge that such property would probably be destroyed or damaged." *See* Iowa Code §§ 712.1, .3 (2020) (defining arson and arson in the second degree). Peterson's primary trial strategy was to argue the State failed to prove he started the fire with the required intent, emphasizing during closing the State's witnesses could not conclusively identify the cause of the fire. On appeal, Peterson raises three evidentiary arguments and appeals his sentence, which we address in turn.

### A.  Fire Investigator Opinion

One of the witnesses at trial was Captain Paul Koenig, an investigator with the Cedar Rapids Fire Department. Peterson filed a motion in limine seeking to prevent Captain Koenig from testifying about the credibility of Peterson or any

witness or offering an "opinion that is not sufficiently based upon scientific, technical, or other specified knowledge, but rather relies upon statements from [Peterson] and other witnesses." In response, the court ruled that Captain Koenig was allowed to testify the house fire was caused by an act of a person, but he could not testify the fire was intentionally set, as opposed to accidentally set, or that Peterson had started the fire. However, the court added that it "did not have the benefit of any proffer testimony from Captain Koenig regarding the basis for his conclusion that the fire was intentional." During the trial, the State again requested Captain Koenig be allowed to testify the fire was intentionally set, or "incendiary." The court affirmed its limine order that Captain Koenig "cannot say that this was an intentionally set fire." The court and the attorneys then had the following exchange to clarify the order:

> THE COURT: . . . . I think he can say that this was caused, in his opinion, by an act by a person. And that as I said earlier, mattresses don't naturally start on fire and, therefore, there had to have been some act by a person, whether that person intentionally wanted to set the mattress on fire or was smoking in a bed and the cigarette fell. I don't see anything in the expertise portion of his reports or his testimony that indicates how he can rule out one or the other, other than just that he didn't find things like a lighter maybe or cigarettes or something like that.
> And then certainly, [prosecutor], I think you can argue based on all of those facts that this clearly was an intentional fire.
> So I don't know that I'm saying he can't use the word incendiary. Part of the definition of incendiary is that there's fire where there shouldn't be, and I think he can testify to that. But there has to be the caveat that he is not testifying as to what [Peterson's] objective intent was. And so that's probably something that [the prosecutor] would need to have him explain in his testimony or certainly [defense counsel] would have him explain.
> Any questions about the Court's ruling, [prosecutor]?
> PROSECUTOR: Can say incendiary, can define it, but then I can ask the follow-up question, but you're not testifying to his objective intent or you're not testifying to what [Peterson's] intent was

at the time that this fire got lit. Am I saying that correctly or am I missing something?

THE COURT: I'm saying he can't—I'm not saying he can't say the word incendiary, but I don't believe he can rule out, yes. I don't believe he can rule out accidental causes and say that [Peterson] had a subjective intent to start the fire.

PROSECUTOR: If in defining incendiary, he defines it without implying that that intentional act belonged to [Peterson], he can still define what an incendiary is versus what an accidental is?

THE COURT: I think he can define all four of the categories.

PROSECUTOR: Okay. And then just here's what I looked at when I was doing my investigation—

THE COURT: Right.

PROSECUTOR: —only more fancy.

THE COURT: And he can testify to his observations and his expertise regarding his observations, but ultimately he cannot state any conclusion that [Peterson] intentionally wanted to—subjectively his intent was to set the house on fire.

. . . .

DEFENSE COUNSEL: Just one point of clarification—and I understand the Court's ruling. The witness will not be allowed to say it's an incendiary fire just because it includes that intentional part of the definition.

THE COURT: Well, it also includes, unless I'm misunderstanding this, I'm not a fire expert, but it also includes fire where there shouldn't be fire, is my understanding. And so I agree he cannot say that it was incendiary based on an intentional act, but if he believes that it's incendiary based on that second prong, I don't know that that would violate my order because it doesn't talk about [Peterson's] objective intent.

DEFENSE COUNSEL: And just for that point of clarification, Your Honor, I just want to be very careful that we don't get a two-part definition and then testimony that he concludes that it's incendiary without—I think we just need to be very careful about how that's phrased.

THE COURT: Right. And, [prosecutor], I think just to make sure we're not misleading the jury unintentionally, I would ask during your direct that you clarify so the jury understands he's not making a statement on [Peterson's] intent.

PROSECUTOR: Can do that.

THE COURT: Okay. [Defense counsel], you had your hand up.

DEFENSE COUNSEL: I'm sorry. Just to read this definition out loud again. An incendiary fire is defined as a fire that is intentionally ignited in . . . the area or under circumstances where and when there should not be a fire. So there's two parts to that

definition. I just don't want a conclusion that it's the first part, a fire intentionally ignited in the area. Does that make sense?

THE COURT: Right. And I'm—he doesn't have to rule that out, obviously, because he believes that is the—that it was intentionally ignited, but I think that will be clear to the jury when—when [the prosecutor] asks him and he testifies that he's not making any comment on [Peterson's] intent.

All right. And so with that, I think my—my order in limine basically stands then because that deals with subjective intent, and he can't—and I don't think he's planning to, but he can't testify that [Peterson] was the person who caused that human act or human intervention, and he cannot testify that in his opinion what happened at the house was an arson.

Peterson argues this ruling was an abuse of discretion.

An expert may offer an opinion "if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702. The expert may base this "opinion on facts or data in the case that the expert has been made aware of or personally observed." Iowa R. Evid. 5.703.

Captain Koenig authored a report—not submitted to the jury—in which he determined the house fire began in the basement with a mattress located at the area of origin. Captain Koenig toured the home, viewed the security videos, and spoke to other law enforcement and witnesses, including O'Brien and Peterson. Based on his investigation, he concluded in his report that the fire was intentional, O'Brien was credible, Peterson was not credible when he claimed he awoke to find the house already on fire, and probable cause existed to charge Peterson with arson in the second degree. During voir dire—outside the presence of the jury— Captain Koenig acknowledged his primary basis for concluding the fire was intentional was "witness statements made by [Peterson] and [O'Brien] and video."

Peterson argues Captain Koenig's report and voir dire testimony show his opinion was improperly based on information other than scientific or specialized knowledge. However, an expert may rely on any information the expert "has been made aware of or personally observed," so long as the ultimate conclusions represent "scientific, technical, or other specialized knowledge." Iowa Rs. Evid. 5.702, .703; *see also Tyler*, 867 N.W.2d at 162 ("[T]here are circumstances when a medical examiner's opinions on cause or manner of death may assist the jury, even when such opinions are based in part on witness statements or information obtained through police investigation."). In ruling on the motion in limine, the court carefully differentiated between the testimony Captain Koenig was and was not permitted to present. Consistent with the court's ruling, Captain Koenig then testified to his investigation, including his personal observations of burn and soot marks and potential ignition sources at the scene. In doing so, he relied on his specialized knowledge to explain why he excluded accidental and natural causes and concluded the fire involved some form of human intervention. *See id.* at 161 (stating an expert "cannot base the opinion solely on facts that are just as easily understood by a layperson") (citation and emphasis omitted). He also testified the fire was "incendiary," which included both accidental and intentional human intervention. But, pursuant to the court's prior orders, he did not testify the fire was intentionally set or that Peterson set the fire. Therefore, the court did not abuse its discretion in admitting Captain Koenig's expert opinion as sufficiently based on his specialized knowledge.

B. Bad-Acts Evidence

Peterson challenges the admission of two sets of evidence that he argues were improper bad-acts evidence: evidence from O'Brien of Peterson's behavior when intoxicated, and evidence he resisted law enforcement by threatening to shoot officers when they arrived at the home after the fire. Evidence of a person's crimes, wrongs, or acts is not admissible "to show that on a particular occasion the person acted in accordance with the character." Iowa R. Evid. 5.404(b)(1). However, such evidence "may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Iowa R. Evid. 5.404(b)(2).

Courts use a three-step analysis to determine whether bad-acts evidence is admissible. *State v. Putman*, 848 N.W.2d 1, 8 (Iowa 2014). First, the evidence must be "relevant to a legitimate, disputed factual issue." *Id.* at 9. Second, the State must provide "clear proof the individual against whom the evidence is offered committed the bad act or crime." *Id.* (quoting *State v. Sullivan*, 679 N.W.2d 19, 25 (Iowa 2004)). Third, the court must weigh the evidence to determine whether the "probative value is substantially outweighed by the danger of unfair prejudice to the defendant." *Id.* (quoting *Sullivan*, 679 N.W.2d at 25 (Iowa 2004)).

1. O'Brien's testimony regarding Peterson's behavior when intoxicated

At trial, O'Brien testified that when Peterson was intoxicated, he was "[b]elligerent and vulgar" and called her "not nice names." She further testified he did things when intoxicated that made her fearful, including lunging at her with his hand in the air. Peterson concedes clear proof of his behavior exists, and he only

challenges this evidence's relevance and unfair prejudice. *See Putman*, 848 N.W.2d at 9.

As to relevancy, Peterson asserts the sole issue at trial was the State's theory that he intentionally started the house fire either out of anger at O'Brien or as an attempted suicide. Because there was no evidence he ever threatened to start a fire when intoxicated, he argues evidence of his intoxicated behavior was not relevant.

"The general test of relevancy is 'whether a reasonable [person] might believe the probability of the truth of the consequential fact to be different if [the person] knew of the proffered evidence.'" *Id.* (alterations in original) (quoting *State v. Plaster*, 424 N.W.2d 226, 229 (Iowa 1988)). Evidence of Peterson's intoxicated behavior was relevant for two purposes. First, his intent was an issue at trial, and his behavior toward his wife in prior interactions is relevant to his intent and state of mind at the time of the fire. *See State v. Taylor*, 689 N.W.2d 116, 125 (Iowa 2004) ("[T]he defendant's prior conduct directed to the victim of a crime, whether loving or violent, reveals the emotional relationship between the defendant and the victim and is highly probative of the defendant's probable motivation and intent in subsequent situations."). Second, Peterson told law enforcement that he awoke that morning to find the house on fire and O'Brien must have started the fire in an attempt to kill him. Thus, evidence O'Brien was fearful or at least uncomfortable around Peterson when he was intoxicated was also relevant to show she left the house after he berated her and before any smoke was seen on video.

As to unfair prejudice, courts evaluate

> the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the . . . bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*Putman*, 848 N.W.2d at 9–10 (quoting *Taylor*, 689 N.W.2d at 124). Again, Peterson's behavior while intoxicated is relevant to show his intent and why O'Brien left the home. He concedes the clear proof of his belligerent and vulgar behavior. The State lessened the danger the jury would decide the case on any improper basis by noting this behavior only occurred when Peterson was intoxicated and Peterson never "put his hands on" O'Brien while intoxicated. Thus, the danger of unfair prejudice does not outweigh the probative value of the evidence of Peterson's behavior while intoxicated. Because this evidence was also relevant, the court did not abuse its discretion in admitting this bad-acts evidence.

### 2. Resisting law enforcement

During trial, the State played a forty-minute phone call between Peterson and Captain Koenig. In the call, the two men discussed the fire and its immediate aftermath, including Peterson's refusal to cooperate with law enforcement and his threats to shoot the officers, which resulted in law enforcement using tear gas and ramming the garage where Peterson was sheltered. Peterson argues these references to resisting law enforcement were not relevant and were prejudicial.

In the limine order, the district court admitted the resisting evidence because it was "'inextricably intertwined' with the alleged arson and is not separate conduct subject to Rule 5.404." His brief to us does not address the inextricably-intertwined

issue. Thus, he has waived any argument on the issue. *See* Iowa R., App. P. 6.903(2)(g)(3); *Soo Line R.R. Co. v. Iowa Dep't of Transp.*, 521 N.W.2d 685, 691 (Iowa 1994) ("[R]andom mention of [an] issue, without elaboration or supportive authority, is insufficient to raise the issue for our consideration.").

Even if the inextricably-intertwined issue were properly presented for our review, "[i]nextricably intertwined evidence is evidence of the surrounding circumstances of the crime in a causal, temporal, or spatial sense, incidentally revealing additional, but uncharged, criminal activity." *State v. Nelson*, 791 N.W.2d 414, 420 (Iowa 2010) (citation omitted). "The inextricably intertwined doctrine bypasses rule 5.404(b) because rule 5.404(b), by its express terms, is only applicable to evidence of other crimes, wrongs, or acts, which is considered to be extrinsic evidence." *Id.* The State's theory—Peterson started the house fire either out of anger at O'Brien or as an attempted suicide—is "unintelligible, incomprehensible, confusing, or misleading" without reference to his behavior immediately following the fire including his resisting law enforcement. *See id.* Therefore, we find no abuse of discretion in the court's finding that evidence Peterson resisted law enforcement was "inextricably intertwined" with the underlying charge of arson.

Furthermore, even if the recorded phone call were not inextricably intertwined with the underlying arson, the court also found the phone call satisfies the bad-acts analysis. Peterson again focuses on the call's relevance and unfair prejudice. He argues evidence he resisted law enforcement is not relevant to whether he committed arson. However, a defendant's "demeanor and activities

immediately following" an alleged crime "may provide a legitimate basis for inferring consciousness of guilt." *Schrier v. State*, 347 N.W.2d 657, 665 (Iowa 1984). Thus, in addition to the court's rationale, Peterson's actions resisting law enforcement immediately after the fire were relevant in determining whether he started the fire with the required intent. Moreover, during the forty-minute phone call, Peterson and Captain Koenig discussed Peterson's entire version of the events leading up to and following the fire without unduly emphasizing his actions when law enforcement arrived. Captain Koenig and other law enforcement witnesses also never testified at trial about Peterson resisting them. Considering Peterson's actions in resisting law enforcement were relevant to his intent and this evidence was infrequently mentioned during the five-day trial, its relevance was not substantially outweighed by the danger of unfair prejudice. *See Putman*, 848 N.W.2d at 8–9. The district court did not abuse its discretion in admitting the references to Peterson resisting law enforcement during his discussion with Captain Koenig.

### C. Sentencing

Peterson argues the district court failed to fully consider all factors before sentencing him to a ten-year term of incarceration. He notes his last criminal conviction before the arson conviction was six years prior for driving on a suspended license and he had several letters of support from family and the broader community.

"The societal goals of sentencing are to provide maximum opportunity to rehabilitate the defendant and to protect the community." *State v. Damme*, 944 N.W.2d 98, 106 (Iowa 2020). "A sentencing court weighs multiple factors,

'including the nature of the offense, the attending circumstances, the age, character and propensity of the offender, and the chances of reform.'" *Id.* (quoting *State v. Formaro*, 638 N.W.2d 720, 725 (Iowa 2002)).

At the sentencing hearing, the district court provided a detailed explanation of the factors it considered in imposing the sentence. The court explicitly referred to Peterson's "fairly lengthy" but "quite dated" criminal history as an adult and letters supporting him that "show someone who is hard-working." Nevertheless, after considering all appropriate factors, especially the seriousness of the offense and his failure to accept responsibility, the court imposed a ten-year term of incarceration.

"[O]ur task on appeal is not to second guess the decision made by the district court, but to determine if it was unreasonable or based on untenable grounds." *Formaro*, 638 N.W.2d at 725. Finding nothing unreasonable or untenable in the district court's detailed explanation of the sentence, we affirm the sentence as within the court's discretion.

## IV. Conclusion

The district court did not abuse its discretion in admitting Captain Koenig's expert testimony, evidence Peterson was belligerent when intoxicated, and evidence he resisted law enforcement after the fire. The sentence imposed was also within the court's discretion.

**AFFIRMED.**