# IN THE COURT OF APPEALS OF IOWA

No. 14-0277
Filed October 28, 2015

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**VERNON HUSER,**
     Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Glenn E. Pille, Judge.


A defendant appeals his conviction following a retrial for first-degree murder, alleging the district court should have granted his motions for mistrial on multiple grounds and the evidence does not support the conviction. **AFFIRMED.**


Alfredo Parrish and Andrew Dunn of Parrish, Kruidenier, Dunn, Boles, Gribble, Gentry, Brown & Bergman, L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Sharon K. Hall, Assistant Attorney General, John P. Sarcone, County Attorney, and Steve Foritano and Michael Salvner, Assistant County Attorneys, for appellee.


Heard by Danilson, C.J., and Vogel and Tabor, JJ.

**VOGEL, Judge.**

Vernon Huser comes before our court, appealing his conviction for first-degree murder after the new trial we ordered in his prior appeal again resulted in a guilty verdict. *See State v. Huser*, No. 10-2067, 2011 WL 6079120, at *1 (Iowa Ct. App. Dec. 7, 2011). While we found the evidence offered at the first trial sufficient to sustain the conviction, we ordered a new trial due to the admission of impermissible hearsay statements made by Huser's coconspirator[1] to various third parties before the murder occurred.

In this appeal following the new trial, Huser asserts the court should have granted his motion for a mistrial when the State solicited testimony leading to the "backdoor" admission of some related hearsay statements. He also claims the court should have stricken all of the testimony from that witness or given a curative jury instruction. He alleges the prosecutor committed misconduct by referencing the first trial, failing to disclose evidence, and soliciting the hearsay testimony referenced above. He claims the court should have permitted him to offer evidence from Woolheater's alleged coconspirator, who would testify Woolheater had an independent motive to kill the victim. He challenges the sufficiency of the evidence to sustain his conviction. Finally, he claims the cumulative errors in the second trial mandate another new trial.

We conclude the court did not abuse its discretion in denying each of the motions for mistrial. We also find no error in the court ruling that evidence of

---

[1] The coconspirator was Louis Woolheater, whose conviction for first-degree murder was affirmed by our court the same day we reversed and remanded Huser's case for a new trial. *See State v. Woolheater*, No. 10-0478, 2011 WL 6079094, at *1 (Iowa Ct. App. Dec. 7, 2011).

Woolheater's alternative motive could be offered but that it would open the door for the State to offer evidence to support its theory of motive. Finally, we find sufficient evidence to support the conviction. Therefore, Huser's conviction is affirmed.

## I. Background Facts and Proceedings.

Huser was accused of soliciting Louis Woolheater to murder Lance Morningstar because Morningstar had an affair with Huser's ex-wife, Deb Huser, during the couple's marriage. The complete background facts and proceedings were thoroughly laid out in the prior opinions from our court and need not be repeated here.[2] *See Huser*, 2011 WL 6079120, at *1-2; *Woolheater*, 2011 WL 6079094, at *1-3. Following our remand, a new trial was commenced on November 18, 2013, whereby Huser faced charges once again for first-degree murder for aiding and abetting Woolheater in the killing of Morningstar. After hearing testimony from witnesses for fourteen days, the jury found Huser guilty. He now appeals.

## II. Scope and Standard of Review.

Whether a mistrial should have been granted is reviewed for an abuse of discretion. *State v. Frei*, 831 N.W.2d 70, 73–74 (Iowa 2013). We permit the district court broad discretion in deciding whether to grant a mistrial because it is in the best position to appraise the effect of any alleged misconduct. *Id.* at 80. In order to establish reversible error, Huser "must show the violation of the limine order resulted in prejudice that deprived [him] of a fair trial." *See id.* We likewise

---

[2] To the extent the evidence introduced at the new trial varied from the evidence at the first trial, we will outline the evidence later in the opinion.

review denials of motions for mistrial based on prosecutorial misconduct for abuse of discretion. *State v. Greene*, 592 N.W.2d 24, 30 (Iowa 1999).

We review a court's decision to admit or exclude evidence for an abuse of discretion; however, we review claims evidence should or should not have been admitted based on hearsay grounds for correction of errors at law. *State v. Paredes*, 775 N.W.2d 554, 560 (Iowa 2009).

Finally, we review the sufficiency of evidence for the correction of errors at law. *State v. Edouard*, 854 N.W.2d 421, 431 (Iowa 2014). We consider all the evidence in the light most favorable to the State and will uphold a verdict if substantial record evidence supports it. *Id.* at 437.

## III. Mistrial—Hearsay.

In the first appeal decision, we ordered a new trial based on the admission of hearsay from three different witnesses regarding statements Woolheater made before Morningstar's disappearance. *See Huser*, 2011 WL 6079120, at *10–13. Only the statement made by Patti Mitrisin, one of Woolheater's girlfriends, is at issue in this appeal. At the first trial, Mitrisin testified Woolheater told her that "there was a guy messing around with Vern's wife or ex-wife . . . and he (Huser) wanted this guy roughed up." *Id.* at *11. We concluded this statement, along with testimony from two other witnesses conveying statements Woolheater made before Morningstar was killed, were improperly admitted hearsay statements.[3] In addition, we concluded Huser was prejudiced by these three witnesses'

---

[3] In the prior appeal, the State did not argue these statements fell within one of the hearsay exceptions, but instead, the State only argued the statements were admissible for the nonhearsay purpose of showing Woolheater's responsive conduct and motive. *Huser*, 2011 WL 6079120, at *10.

statements as this evidence was "the strongest evidence of Huser's incitement of Woolheater to commit the murder" and a new trial was required. *Id.* at *13.

In preparation for the new trial, the district court ruled Mitrisin's statement, along with the other statements we found improperly admitted, was inadmissible under the "law of the case" doctrine. *See Russ v. Am. Cereal Co.*, 96 N.W.2d 1092, 1092 (Iowa 1903) ("It is the settled rule in this state that the decision of this court upon the first appeal becomes the law of the case, and is to govern upon a subsequent trial thereof in the district court, and upon another appeal, unless the facts before the court upon the second trial are materially different from those appearing upon the first."). Neither party challenges the district court's pretrial ruling.

Prior to Mitrisin's testimony at the new trial, the State and defense counsel met to confirm the questions that would be asked of Mitrisin. Defense counsel agreed Mitrisin could testify as to Huser's identity as the person she saw Woolheater meet with prior to the murder, but it was defense counsel's understanding Mitrisin's testimony would go no further. During the direct examination by the State, Mitrisin testified that she observed Woolheater meet with Huser at a storage building. The State then went on to ask:

> Q. Okay. Could you hear what they were talking about? A. No, I could not.
> Q. Could you observe their demeanor? A. Just like two men talking.
> Q. Okay. I know it's been a long time, but do you remember when this interaction occurred? A. The best that I can remember would have to be the end of August or the first part of September.
> Q. And that would be in the year 2004? A. Right.
> Q. I do have just a couple of quick questions. Now, without telling me what Mr. Woolheater said, did he *ever* speak of Lance Morningstar? A. Yes.

> Q. Without telling me what Mr. Woolheater said, did he *ever* speak about Deb Huser? A. Yes.
> Q. And without telling me what Mr. Woolheater said, did he speak about Vern Huser? A. Yes.
> Q. But you did not know these people at all? A. I did not.

(Emphasis added.) Defense counsel made no objection to this testimony at the time it was offered, nor was a request to strike these questions made, but defense counsel did ask to make a record outside the presence of the jury after the State was through with its direct examination. A discussion was held off the record before defense counsel briefly cross-examined Mitrisin. The jury was then excused for the day, and defense counsel made a motion for a mistrial based on the State's improper solicitation of the inadmissible hearsay. The State maintained the questions asked were not those excluded by the prior opinion— "there was a guy messing around with Vern's wife or ex-wife . . . and he (Huser) wanted this guy roughed up"—but rather only asked Mitrisin whether Woolheater *ever* spoke of Huser, Morningstar, and Deb. *See United State v. Wells*, 347 F.3d 280, 289–90 (8th Cir. 2003) (noting that the State's questions to the law enforcement officer to explain what the officer asked the informant to do and what the officer saw the informant do was not inadmissible hearsay as the testimony was limited to the officer's observations of conduct and the officer's unilateral instructions to the informant).

Defense counsel was permitted to further argue his motion for a mistrial the next morning before trial resumed. Counsel recounted that when the first improper question was asked he "couldn't believe it. I grabbed the note. I wrote out—and I don't know whether I have it here or not—I wrote, mistrial. I passed it across to [co-counsel]." Counsel stated he did not jump up and yell mistrial

because it brings the attention of the jury to that issue. Counsel again restricted his remedy request to a mistrial and did not seek to have the testimony stricken from the record or for the jury to be admonished to disregard it. The court reserved ruling on the motion so that it could further review the law and arguments of counsel.

The next day the court noted the standing rule for this trial was if there was a question about whether or not a statement was hearsay, it was to be first brought to the attention of the court and defense counsel outside the presence of the jury so that all would be aware of it and the court could hear argument about the evidence to be introduced. The court found the testimony solicited from Mitrisin by the State was hearsay and while "the State did not violate a specific ruling of the court in that respect, . . . it violated the spirit of the ruling by, at a minimum, not addressing it first with the Court and defense counsel before going into it." However, the court concluded the admission of this hearsay evidence did not warrant a mistrial as "there is clearly other evidence before this jury to support" the fact Woolheater "spoke" of Huser, Deb, and Morningstar. The court concluded any harm caused by the admission of the hearsay was minimal and did not require a mistrial.

At this point, two days after the hearsay testimony was introduced, defense counsel then asked the court to strike the three offending questions, "to strike Mitrisin's testimony," to give the jury an admonition to disregard the testimony during deliberations, and to prohibit the State from using the testimony in its closing argument. The State had no objection to the court "striking those three questions" posed to Mitrisin or the jury being admonished to disregard it,

but it noted such an admonishment at this point would simply highlight the testimony for the jury. Defense counsel stated that they could work out an agreement with the State on a motion to strike the testimony but that it was not urgent to do so at that time. The court noted it was willing to let the attorneys work out what admonishment, if any, should be given to the jury.

A few days later, still during the jury trial, defense counsel filed a written motion to strike the entirety of Mitrisin's testimony. Counsel stated that there was no way to remove the offending three questions without specifically identifying and signaling out the testimony. Therefore, counsel asserted the only fair thing to do in order to remove the offending testimony without highlighting it for the jury was to strike all of Mitrisin's testimony with an admonition that would state: "The jury is instructed to disregard the entire trial testimony of Patti Mitrisin. Her testimony shall not be considered by you when deliberating this case."

The mistrial motion was again renewed at the end of the trial. The court confirmed that it would not grant a mistrial and ruled that it would not strike the entirety of Mitrisin's testimony. The court noted defense counsel was under "some obligation" "to object to the hearsay" at the time it was offered. The court denied defense counsel's request for the court to admonish the State in front of the jury. However, the court did rule the State was not allowed to mention in its closing argument the statements made by Mitrisin that were found to be inadmissible hearsay. The court also denied defense counsel's request to include in the jury instructions an instruction that read:

> During the State's case when presenting the testimony of its witness Patti Mitrisin the State knowingly and intentionally asked improper questions regarding conversations she had with Mr.

Woolheater.  Whatever Mr. Woolheater said to Ms. Mitrisin cannot be considered by you when deciding this case.  Since the State asked improper questions, you may, but are not required to, conclude that . . .  [(1)] The information from the questions would be unfavorable to the State and favorable to Vern Huser.  Or: [(2)] The State acted in bad faith by asking the questions, and you may draw any inference favorable to Mr. Huser.

The court concluded the State did not intentionally and improperly ask the questions of Mitrisin and the defense had an obligation, and failed, to object to those questions.[4]

Huser now appeals the court's denial of his motion for a mistrial and the court's failure to strike the entirety of Mitrisin's testimony or give the requested instruction.  He claims he was prejudiced by the introduction of this hearsay evidence and the court was required to grant a mistrial in order to cure the prejudice.  While Huser requests we apply the test used to determine whether the district court's admission of hearsay caused prejudice, *see State v. Rice*, 543 N.W.2d 884, 887 (Iowa 1996) ("If hearsay is admitted, prejudice to the non-offering party is presumed unless the contrary is affirmatively established."), the

---

[4] The court noted that if defense counsel had asked the court to strike those questions and answers immediately following their admission, it probably would have done so. Due to the court's limine order, defense counsel was not obligated to object to the improper hearsay testimony in order to preserve the error for appeal.  However, we note defense counsel wrote a note to his co-counsel at the time the first offending question was asked that stated he believed a mistrial was warranted but then waited for two more similar questions to be asked and answered and for the State to conclude its questioning, before moving for a mistrial.  *See State v. Bishop*, 387 N.W.2d 554, 564 (Iowa 1986) ("The general rule is that a motion for mistrial must be made as soon as the grounds therefor become apparent.").  In addition, it was not until days later that defense counsel asked that the offending testimony be stricken, at a time when the jury would first need to be reminded of the testimony before being told to disregard it.  Any prejudice now claimed on appeal was compounded by defense counsel's failure to object after the first question was asked, which permitted the State to ask two more similar questions.  To the extent defense counsel claims his client was grievously prejudiced by the offending testimony, counsel had the opportunity and the obligation to nip in the bud whatever prejudice he now claims resulted from this testimony.

issue on appeal is not whether the testimony of Mitrisin is hearsay. The district court decided the questions did call for hearsay testimony and that decision is not appealed.

The issue on appeal is whether the court should have granted Huser's motion for a mistrial after the testimony was admitted. This is reviewed for an abuse of discretion. *Frei*, 831 N.W.2d at 73–74. We also review the district court's refusal to give a requested instruction for an abuse of discretion. *Id.* at 73. "When the error is not of constitutional magnitude, the test of prejudice is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice." *Id.*

Upon our review of the record, we do not find the court abused its discretion. The offending questions were mentioned once to the jury during a fourteen-day trial in which the jury heard testimony from at least forty-five witnesses. *See State v. Newell*, 710 N.W.2d 6, 32–33 (Iowa 2006) (noting the court did not abuse its discretion in denying a motion for a mistrial when the offending testimony was only mentioned once). Other witnesses, including Wes Penney, Larry Webb, and Jackie Putz, testified to seeing Huser and Woolheater together before the murder of Morningstar. In addition, the phone records of Huser and Woolheater show a multitude of calls between the two during the summer of 2004, up until September 30, 2004, when Morningstar went missing. The evidence also showed there was a post-it note in Woolheater's house that contained Deb's new home address, which a handwriting expert testified was probably written by Huser. In addition, police also discovered a printed copy of the county assessor's webpage of Morningstar's house in Woolheater's

residence. Finally, Larry Webb testified Woolheater told him after Morningstar's body was found near Woolheater's residence that only Webb, Woolheater, and Huser knew about Morningstar's body.

Based on the properly admitted evidence connecting Huser and Woolheater together and to Deb and Morningstar, we conclude the court did not abuse its discretion in denying the motion for a mistrial based on the limited hearsay information contained within Mitrisin's testimony. *See id.* at 19 (noting the admission of inadmissible hearsay will not be considered prejudicial if the same evidence was properly in the record). For the same reasons, we likewise conclude the court did not abuse its discretion in declining to give the jury instruction request by defense counsel or to strike the entirety of Mitrisin's testimony.

## IV. Mistrial—Prosecutorial Misconduct.

Next, Huser claims on appeal the court should have granted him a mistrial based on a number of other errors caused by what he claims was prosecutorial misconduct during trial. He again asserts a mistrial should have been granted due to the State's improper solicitation of hearsay testimony from Mitrisin, and we reject this claim for the same reasons stated above. Next, Huser claims a mistrial should be granted due to the State's late disclosure or nondisclosure of certain evidence, and also asserts the State committed prosecutorial misconduct by making several references to the fact that there had been a prior trial.

**A. Late or Nondisclosure of Evidence.** Huser claims the court should have granted a mistrial when the State failed to timely comply with discovery. Specifically, he claims the State improperly destroyed the polygraph data from an

examination of Lynn Morningstar, the victim's son. While defense counsel had the report of the polygraph examination, they did not have the underlying data, which contained Lynn's reactions to the questions posed. In addition, during voir dire the State provided a police dash cam video taken when Lynn, Huser, and others met after Morningstar went missing. The police report generated from this incident had been provided, but the video was first turned over to defense during jury selection.

In denying the motion for a mistrial, the court found that there had not been any intentional destruction of evidence or bad faith on the part of the State regarding the polygraph data. In addition, the court found that there was no showing that the data contained any exculpatory evidence. The court also concluded the defense was fully aware of the incident involving Huser and Lynn at a local bar following Morningstar's disappearance and the DVD contained no surprises.

**B. References to the Prior Trial.** Huser also claims a mistrial should have been granted because of the references the State made to the fact that there had been prior trials involving Huser and Woolheater.

*1. Deb's testimony*. During Deb's testimony, defense counsel was cross-examining her regarding when her relationship began with Morningstar. Defense counsel was pointing out that Deb had given a different date of when the relationship began during her deposition testimony than she had during her testimony at trial. While attempting to show Deb her prior deposition testimony, the State interrupted stating, "I'm sorry. Are you talking about the deposition or the trial transcript?" Defense counsel asked for an off-the-record discussion, and

the court excused the jury so that the mistrial motion could be argued. The prosecutor apologized for the inadvertent statement, noting he was having trouble locating the portion of Deb's testimony that defense counsel was referencing. The court denied the mistrial motion but did indicate a willingness to give an admonition or a curative instruction if that is what defense counsel wanted to do. The next day, defense counsel declined to request a curative instruction, stating that it would do more damage than good.

*2. Robert Bunce's Testimony.* During the testimony of Robert Bunce, a friend of Huser's, the State made several references to Bunce's "prior sworn testimony" while attempting to refresh the witness's recollection. After defense counsel made a motion for a mistrial, the court noted the prior agreement between the attorneys was to refer to prior testimony as a "prior sworn statement," and the court officially sanctioned that agreement. However, the court denied the mistrial motion.

*3. Kevin Frey's Testimony.* During the testimony of Kevin Frey, a friend of Huser's, the State asked him whether he knew Woolheater. Frey responded that he attended Woolheater's "trial or gave a deposition at his trial. That's the only time I have ever met him." No objection was made, but defense counsel did ask to approach the bench, and a discussion was held off the record. The next day before the jury trial resumed, defense counsel asked for a mistrial based on that statement. The State, in resistance to the motion, asserted it had advised each witness not to mention the prior trials and that the response from Frey was not anticipated or solicited. The court later denied the motion, concluding the answer given by Frey was likely the result of an "inarticulate question" that failed to

specify a time frame when asking whether Frey knew Woolheater. While the court determined the statement was totally inadvertent, the statement did violate the court's limine ruling. However, the court determined a mistrial was not warranted in light of the admonition it gave to the jury to decide the case based only on the evidence presented during the trial.

*4. Huser's Testimony.* Finally, during Huser's testimony, the State repeatedly emphasized Huser's "testimony today." Defense counsel asserted the use of this phrase was to infer to the jury that there had been a prior trial or that Huser's testimony was different than prior testimony. The prosecutor asserted he had routinely used that phrase during cross-examination in order to lock a witness to their testimony and pointed out to the court that the same phrase had been used in Huser's first trial. The use of the phrase in the first trial showed he was not commenting on the prior trial because there had been no prior trial at that time. The prosecutor further explained he was placing vocal emphasis on the words in this proceeding because he had asked the court reporter to bookmark the locations in the transcript when that phrase was used so it could be quickly retrieved later.

The court again denied the motion for a mistrial finding nothing improper with the use of the phrase "testimony today" and there was no improper inflection placed on the word "today." The court likewise was not convinced that there was anything improper with the prosecutor asking the court reporter to bookmark certain locations in the transcript.

**C. Prosecutorial Misconduct Analysis.** To prevail on a claim of prosecutorial misconduct, Huser must provide both misconduct and resulting

prejudice. *See State v. Krogmann*, 804 N.W.2d 518, 526 (Iowa 2011). When evaluating prejudice, the court considers "(1) the severity and pervasiveness of misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or other curative measures; [and] (5) the extent to which the defense invited the misconduct." *Id.* "Ordinarily a finding of prejudice results from [p]ersistent efforts to inject prejudicial matter before the jury." *Id.*

The district court concluded there was no misconduct regarding the late disclosures of the police video or the destruction of the polygraph data, and we agree. Huser is not entitled to a mistrial on those grounds.

With regard to the testimony referencing the prior trial or prior testimony, we likewise agree with the district court that there was no misconduct. The prosecution apologized for mistakenly referencing the "trial transcript" during the cross-examination of Deb. The district court indicated a willingness to give an admonition or curative instruction to the jury, but defense counsel declined the invitation. The prosecutor used both the terms "prior sworn testimony" and "prior sworn statement" interchangeably during the testimony of Bunce. While there may have been a private agreement between the State and defense counsel regarding how to refer to the prior testimony of the witnesses, the court did not sanction that agreement and affirmatively require any references to be "statements," rather than "testimony," until after Bunce's testimony.[5]

---

[5] In fact, we note the record indicates that defense counsel earlier in the trial referenced that the agreement between the parties was to refer to these statements as "prior sworn testimony."

As to Frey's reference to Woolheater's trial, Frey had been advised prior to his testimony not to refer to the prior trials of Woolheater or Huser. The same question had been posed to other witnesses without any improper testimony regarding the prior trials, and the State subsequently modified its question to specify a time period when inquiring whether certain witnesses knew Deb, Huser, Woolheater or Morningstar. Finally, we agree that there was nothing improper with the State asking Huser to clarify his "testimony today." Because Huser cannot establish the State committed misconduct, we affirm the district court's denial of his many motions for mistrial founded on claims of prosecutorial misconduct.

## V. Exculpatory Evidence.

Next, Huser asserts the district court abused its discretion when it prevented him from introducing evidence, through the testimony of one of Woolheater's girlfriends, Michelle Zwank, that Woolheater had an independent motive to kill Morningstar. According to the offer of proof Huser proffered at trial, Zwank would testify Woolheater told her a couple of days before the murder that Morningstar had something against Woolheater that could send Woolheater back to jail.[6] Woolheater told her that two people, Ricky and Mark, would help him deal with Morningstar. Zwank drove Woolheater to a ball field on the night of the murder, and Woolheater looked at his phone, telling Zwank, "They're here," before leaving the vehicle with a soft-sided bag. After she picked up Woolheater later that night, he told her he had to take care of Morningstar because he had

---

[6] Woolheater was on probation at the time of the murder.

something against him about his past. Finally, Woolheater told her that "Ricky made one hell of a shot."

The State objected to the admission of these statements, asserting it was improper to exclude statements Woolheater made to other witnesses referencing his motive to kill or "rough up" Morningstar for Huser because of the affair between Deb and Morningstar, and at the same time permit these statements Woolheater made to Zwank in an attempt to prove Woolheater killed Morningstar based on an independent motive. The court agreed, concluding that while it would permit defense counsel to introduce these statements from Zwank, doing so would open up the door to permit the State to introduce the statements Woolheater made to other witnesses showing Woolheater's motivation to kill Morningstar came from Huser because of Huser's anger over the affair—statements our prior opinion determined were hearsay statements and the district court had ruled were inadmissible at the new trial based on the "law of the case" doctrine.[7] *Huser*, 2011 WL 6079120, at \*7.

Huser maintains Woolheater's statements to Zwank are admissible under three exceptions to the hearsay prohibition: (1) the evidence of Woolheater's

---

[7] The court noted that the "law of the case" doctrine may no longer be applicable if Zwank is considered to be a coconspirator because it would present a "different theory than that which was presented to the Court of Appeals." *See Russ*, 96 N.W.2d at 1092 (Iowa 1903) (noting the law of the case will govern a subsequent trial "unless the facts before the court upon the second trial are materially different from those appearing upon the first"). This new theory would "open the door for this Court to determine, based on her coconspirator status as well as Woolheater's coconspirator status, what evidence would be admissible." The court clarified, "allowing those coconspirator statements in, then I think that opens the whole door to the original Court of Appeals' decision about what's admissible and what's not admissible from Woolheater in terms of his being a coconspirator." The court considered the offering of Zwank's statements to change "the whole situation as far as what I've held in terms of being consistent with the Court of Appeals' decision."

independent motivation to kill Morningstar is admissible because it is inextricably intertwined with the facts of the murder, (2) Zwank and Woolheater were coconspirators and the statements are admissible as a statement from a coconspirator, and (3) Woolheater's statements are admissible as a statement against interest. Huser claims the court's exclusion of these statements violated his due process rights to present his defense.

**A. Inextricably Intertwined.** Generally, evidence of other crimes, wrongs, or acts is not admissible to prove a person's character. *See* Iowa R. Evid. 5.404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith."). However, the evidence can be admissible if the evidence is "deemed inextricably intertwined with the crime charged." *State v. Nelson*, 791 N.W.2d 414, 419 (Iowa 2010). "Inextricably intertwined evidence is evidence of the surrounding circumstances of the crime in a causal, temporal, or spatial sense, incidentally revealing additional, but uncharged, criminal activity." *Id.* at 420. The crime charged and the uncharged acts must both involve the defendant. *Id.* at 421 (citing Jennifer Y. Schuster, *Uncharged Misconduct Under Rule 404(b): The Admissibility of Inextricably Intertwined Evidence*, 42 U. Miami L. Rev. 947, 955 (1988)).

The evidence of Woolheater's statements to Zwank implicating an independent motive to kill Morningstar does not fit within the inextricably intertwined doctrine because, among other things, the statements do not implicate or involve Huser, the defendant. The statements only implicate

Woolheater, who is not a defendant in this case. In addition, the statements do not involve uncharged crimes.

**B.  Statement of Coconspirator.**  Next, Huser maintains that the statements were admissible as statements of a coconspirator. Huser asked the district court, and asks us on appeal, to find that Zwank was Woolheater's coconspirator based on Zwank's activities with Woolheater surrounding the murder.

Zwank testified that she and Woolheater planned to celebrate her birthday on the night of September 30, 2004. Zwank drove to Woolheater's home where she waited for him to be ready to leave. The two then drove around Des Moines until she dropped Woolheater off at a baseball diamond after 9 p.m., and Woolheater carried with him a small pouch that looked like a pool cue case. Zwank then drove around for over an hour waiting for Woolheater to contact her so the two of them could get together to celebrate her birthday. Woolheater called her several times during this period to see if she was still around, and eventually, he asked her to pick him up in the driveway of what turned out to be Morningstar's house, though Zwank did not know whose house it was at the time.

While the two were driving around, Woolheater directed Zwank back to that same house, and Woolheater proceeded to drive Morningstar's vehicle to a local bar's parking lot, followed by Zwank in her vehicle. The two drove back in Zwank's vehicle to Morningstar's house where Woolheater told her to come help him load a wrapped bundle into the trunk of Zwank's car. Zwank tried to grab the bundle where Woolheater directed her to, and she felt what she thought was "legs, feet." While Woolheater kept encouraging Zwank to try to lift the bundle,

Zwank testified she could not do so because of her back condition and her broken foot; so she left him standing there with the bundle. Eventually, Woolheater was able to place the bundle in the trunk, and the two drove away in Zwank's car together.

The two next returned to Morningstar's house with Woolheater driving his own pickup, and Zwank driving her car with the bundle in the trunk. Woolheater loaded Morningstar's lawnmower into the bed of the pickup truck. The pair then drove Zwank's car and Woolheater's pickup with the lawnmower to Woolheater's house where Zwank was directed to drive her vehicle behind Woolheater's house. Zwank testified she sat in her vehicle for a while "just shocked, overwhelmed, not sure what [she] wanted to do." She wanted to leave right away but Woolheater persuaded her to come inside his house. She stayed thirty or forty minutes "having a breakdown," and Woolheater "kept trying to get [her] to calm down, to relax." She eventually left, driving Woolheater's pickup back to her home, as Woolheater had already off-loaded the lawnmower, and leaving her vehicle, with the bundle in the trunk, behind Woolheater's house.

As stated in our prior opinion,

> An admission is not hearsay if "[t]he statement is offered against a party and is . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Iowa R. Evid. 5.801(d)(2). To admit evidence under this rule, the trial court must find "that there was a conspiracy, that both the declarant and the party against whom the statement is offered were members of the conspiracy, and that the statements were made in the course and in furtherance of the conspiracy."

*Huser*, 2011 WL 6079120, at *9. However, a conspiracy under the evidentiary rule includes "a combination or agreement between two or more persons to do or

accomplish a criminal or unlawful act, or to do a lawful act in an unlawful manner." *Id.* The evidence in this case showed Zwank's participation in acts following the murder of Morningstar, but there was no evidence to show Woolheater and Zwank had some type of agreement to murder Morningstar or that Zwank came to Des Moines that night for the purpose of assisting Woolheater in the murder.

The evidence showed Zwank was present with Woolheater before the murder, she was aware of Woolheater's statement that Morningstar had information that could send Woolheater back to jail, she dropped him off where he directed her to, and she assisted Woolheater after the murder was accomplished by transporting the bundle containing Morningstar's body. But this evidence falls short of proving a conspiracy between Zwank and Woolheater to accomplish the murder. "[C]ircumstantial evidence that proves mere presence at the scene of the crime or association with those involved in the crime is not sufficient to show an agreement. Mere presence or general association creates no more than conjecture and speculation of criminal complicity." *State v. Kern*, 831 N.W.2d 149, 159 (Iowa 2013) (internal citations and quotation marks omitted). Therefore, the statements made by Woolheater to Zwank that Morningstar had something against Woolheater that could send Woolheater back to jail do not fit within the coconspirator exception because Zwank is not a coconspirator in the murder.

**C. Statement Against Interest.** Finally, Huser maintains that the statements Woolheater made to Zwank are admissible under the statement against interest exception to the hearsay rule. Iowa Rule of Evidence 5.804(b)(3)

provides a statement made by an unavailable declarant is admissible if the statement

> was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Because the statements Huser seeks to offer exposes Woolheater to criminal liability and were offered to exculpate Huser, corroborating circumstances must clearly indicate the trustworthiness of the statement. Iowa R. Evid. 5.804(b)(3). "The corroboration rule must require something more than the inherent trustworthiness associated with a declaration against interest. Otherwise, the additional sentence would be written out of the rule." *State v. Paredes*, 775 N.W.2d 554, 566–67 (Iowa 2009). "The best approach to determining whether a statement is adequately corroborated appears to be a multifactored test in which all evidence bearing on the trustworthiness of the underlying statement may be considered." *Id.* at 567. These factors include:

> (1) whether there is any apparent motive for the out-of-court declarant to misrepresent the matter, . . . (2) the general character of the speaker, . . . (3) whether other people heard the out-of-court statement, . . . (4) whether the statement was made spontaneously, . . . (5) the timing of the declaration[, and (6)] the relationship between the speaker and the witness.

*Id.* at 568. "'The court should only ask for sufficient corroboration to 'clearly' permit a reasonable man to believe that the statement might have been made in good faith and that it could be true.'" *Id.* (quoting *People v. Barrera*, 547 N.W.2d

280, 289 (Mich. 1996)). Huser claims sufficient corroboration was provided here as Woolheater was indisputably connected to the crime by time and place and the statements were sufficiently spontaneous.

Turning to the multifactored test, there does appear to be a motive for Woolheater to misrepresent the matter to Zwank in order to protect his friend, Huser, when seeking Zwank's assistance in moving the body and providing transportation services. As to the general character of the speaker, there was evidence that Woolheater was known by all who knew him to lie. The evidence established that Woolheater had five girlfriends at the same time who all thought they were in an exclusive relationship. He would also brag about being a mercenary with a high kill ratio. As to the third factor, no other person heard these statements Woolheater made to Zwank, and there was also no evidence Woolheater made similar statements to other people. Huser maintains that these statements were spontaneous, but the record is unclear as to the timing of the statements and whether they were made as a result of questions posed by Zwank. As to the timing of the declarations, the statements were made immediately before and after the killing, and at least to the statements made after the killing, the statements were used to explain to Zwank why Woolheater was asking her to load a bundle appearing to be a dead body into her trunk. As to the sixth factor, Woolheater and Zwank were in a romantic relationship, but clearly the relationship was not exclusive on Woolheater's part.

In addition to the factors above, we note there is no indication in the record what information Morningstar had on Woolheater that could have sent Woolheater to jail, though Woolheater's status as a probationer was admitted at

trial. There is also no evidence that Morningstar even knew who Woolheater was, let alone that he was privy to any information about Woolheater. Based on this limited record, we conclude there was insufficient corroboration to support Woolheater's statements being admitted pursuant to the statement-against-interest hearsay exception.

In addition to concluding that the evidence offered at trial was insufficient to support the argument that these statements fit within one of the hearsay exceptions now argued on appeal, we also conclude the district court did not abuse its discretion when it ruled that if Zwank statements were offered at trial, defense counsel would open the door for the other statements Woolheater made to the other witnesses. These other statements by Woolheater, outlined in our prior appeal decision, were similarly focused on Woolheater's motivation to kill Morningstar.

Woolheater told Webb that he had been following Morningstar, had roughed him up by breaking his ribs, and had done so because "Vern wanted something done about it." *See Huser*, 2011 WL 6079120, at *7. Woolheater told Mitrisin, "there was a guy messing around with Vern's wife or ex-wife . . . and he wanted this guy roughed up." *Id.* Finally, Woolheater told Marie Connett, another girlfriend, "there was someone he knew, one of his friend's wives was cheating on him and that he wanted to kill him." *Id.* He told Connett he was going to kill the other man "[b]ecause we stick together." *Id.*

If Huser insisted on offering Zwank's statements to prove Woolheater killed Morningstar because Morningstar had evidence that would send Woolheater back to jail—an independent motive—then the jury should have been

permitted to hear evidence of the State's theory regarding motive in order to get a complete understanding of case, so long as the evidence being offered was otherwise properly admissible. *See Maasdam v. Jefferson Cnty. Farmers' Mut. Ins. Ass'n*, 268 N.W. 491, 492 (Iowa 1936) ("[W]here allegedly inadmissible evidence is admitted on one side, similar evidence is rendered admissible to contradict the same."); *see generally* 6 Wayne R. LaFave, *Search & Seizure* § 11.6(b) (5th ed. 2012) (describing defense tactics that "open the door" to evidence that had otherwise been suppressed based on a Fourth Amendment violation).

## VI. Sufficiency of the Evidence.

In addition to challenging the mistrial and evidentiary rulings of the district court, Huser also challenges the sufficiency of the evidence to establish his guilt for first-degree murder. The jury was instructed that to find Huser guilty of first-degree murder, the State had to prove:

> 1. On or about September 30, 2004, the defendant or someone he knowingly aided and abetted shot Lance Morningstar.
> 2. Lance Morningstar died as a result of being shot.
> 3. The defendant acted with malice aforethought or knew that someone he aided and abetted acted with malice aforethought.
> 4. The defendant acted willfully, deliberately, premeditatedly, and with the specific intent to kill Lance Morningstar or knew that someone he aided and abetted acted willfully, deliberately, premeditatedly, and with the specific intent to kill Lance Morningstar.

*See* Iowa Code §§ 707.2, 703.1 (2003). Huser specifically challenges the proof to support the elements that he aided and abetted Woolheater in shooting Morningstar, that he acted with malice aforethought or knew Woolheater so acted, and that he had the specific intent to kill Morningstar, or knew Woolheater

so acted. Huser claims there was no evidence he advised, encouraged, participated with, or hired Woolheater to harm Morningstar. He further claims there was no evidence Woolheater had knowledge (1) of the affair, (2) Huser was angered by it, or (3) of threats Huser made regarding Morningstar.

As in the prior appeal, we conclude the evidence is sufficient to sustain the conviction following the new trial. Huser's anger toward both Deb and Morningstar was made know to multiple people, including threats to kill Morningstar and Deb. Huser admitted during his testimony he made statements indicating he wanted to harm Morningstar because of the affair, including saying, "I would like to kill that damn one-eyed motherf*****" and going to a bar Morningstar was known to frequent intent on fighting him. Huser developed an alibi by providing the drag-racing schedule to Wes Penney and stating that if anything ever happened to Morningstar, he would be out of town. Huser also checked out Woolheater's credentials as to his knowledge and use of guns.

The threats Huser made on Morningstar's life, heard by several people,[8] stopped abruptly once Morningstar went missing, despite the fact that his death was not confirmed for nearly five months. During the time Morningstar was

---

[8] Deb testified Huser told her: "I'm going to kill the son of a bitch. He will turn up missing one day and no one will ever find his body." These threats continued through August 2004. Jacque Wittick, Deb's good friend, testified Huser told her "daily" he wanted Morningstar "taken out," first "put[ing] the red dot on [Morningstar's] forehead and then put it on Debbie." Stephanie Duncan testified,

> They were always the same threats, that he was going to kill him, that no one would find him, that, you know, he was going to kill Lance.
> Q: Okay. How frequent would these threats be? A: I heard that numerous times over numerous days. At times being said to me, at times being said to other people, at times being said to somebody on the phone. He said it many, many times.
> Q: Okay. Was there ever an occasion when these threats stopped? A: Yes.
> Q: And when did they stop? A: Well, once Lance went missing.

inexplicitly missing, Huser told Gary Netolicky, "They'll find him. Someone will find him when the snow melts." Before Morningstar's murder, Huser told his friend, Kevin Frey, that he would not mind if Morningstar was gone, and after Morningstar's body was found, Huser told Frey, "I'm in big trouble." The day after the body was found, during the police investigation, Larry Webb went into Woolheater's house to talk with him. Webb testified:

> Q: What did Mr. Woolheater say to you? A: He said something about the body wasn't supposed to be there. It was supposed to be in Oklahoma in a pit.
> . . . .
> Q: Do you recall if there was any mention of who knew about this?
> . . . .
> A: Yeah, he told me at the time, he said there was only three of us that knew. It was myself, him, and Vern [Huser].

In addition, the phone records of Huser and Woolheater show a multitude of calls, back and forth, between the two during the summer of 2004, up until September 30, 2004—the day Morningstar went missing. Thereafter, only one call was made from Woolheater to Huser on October 30, and only a handful of calls were placed by Woolheater to Huser in December and January. There were no calls after the murder from Huser to Woolheater, but over twenty calls were placed by Huser to Woolheater in the month preceding the murder. The evidence also showed there was a note in Woolheater's house that contained the new home address of Deb, a home that Deb had occupied since only the first part of August. And a handwriting expert testified the note was "probably" written

by Huser.[9]  In addition, police also discovered a print out of the county assessor's webpage of Morningstar's house in Woolheater's residence.

The evidence further showed Woolheater routinely borrowed large sums of money from the women he was in a relationship with and did not pay it back, evidencing his need for additional income.[10]  In addition, Deb knew Huser routinely kept $10,000 to $15,000 cash on hand in his home.

We find the evidence sufficient to sustain the conviction in this case.

## VII.  Cumulative Errors.

Finally, Huser claims the cumulative effect of the alleged errors denied him a fair and impartial trial.  Because we find no errors based on the individual claims made on appeal, we need not address Huser's claim that the combined prejudice should result in a new trial.

## VIII.  Conclusion.

We conclude the court did not abuse its discretion in denying the many motions of a mistrial based both on alleged prosecutorial misconduct and on the admission of inadmissible hearsay.  We also find no error in the court's ruling that evidence of Woolheater's alternative motive—statements he made to Zwank—

---

[9] The handwriting expert explained at trial the different conclusions he can reach after conducting his analysis.  He can determine there are "indications" that something "may or may not have been written by someone."  He can determine it is "probable" meaning it was probably or probably not written by someone.  He can determine it is "highly probable" that the document was or was not written by someone.  Finally, if he is "convinced" the document was or was not written by someone, he would say he could "identify" or "eliminate" someone as the writer.  In this case, he was only able to come to the conclusion that Huser "probably" wrote the note in question because of the little amount of handwriting and the lack of complexity of the writing on the document in question.

[10] Karen Humphreys testified she loaned him $3200.  Jackie Putz stated he borrowed $10,000 from her.  Michelle Zwank testified he took between $12,000 and $17,000.  None of the women were repaid.

could be offered but that it would open the door for the State to offer evidence to support its theory of motive, so long as those statements were otherwise admissible. Finally, we find sufficient evidence to support the conviction. We affirm Huser's conviction.

**AFFIRMED.**

Danilson, C.J., concurs; Tabor, J., dissents.

**TABOR, Judge.,** (dissenting)

With respect, I dissent in part from the decision to affirm Huser's conviction. I disagree with the majority on two points. First, in my view, the State's elicitation of "backdoor hearsay" through witness Patti Mitrisin violated the district court's motion in limine ruling and required the court to either grant the defense motion for mistrial or to strike her testimony in full. Second, I believe the district court should have allowed Huser to offer exculpatory evidence through the testimony of Michelle Zwank showing Woolheater voiced a motive to kill Morningstar independent of any arrangement with Huser without the threat of "opening the door" to other statements by Woolheater implicating Huser.

I turn first to the "backdoor hearsay" offered through witness Mitrisin. In Huser's first murder trial, Mitrisin was allowed to testify that she saw Woolheater speaking to Huser and when she asked what they were talking about, Woolheater responded "there was a guy messing around with Vern's wife or ex-wife . . . and he wanted this guy roughed up." That was one of three hearsay statements that linked all four of the key players—Vern Huser, Deb Huser, Woolheater, and Morningstar—and which formed the basis for our reversal of Huser's original conviction.

In Huser's second murder trial, under the court's ruling on the motion in limine and by agreement of the parties, the prosecution was cleared to ask Mitrisin about her observation of Woolheater's encounter with Vern Huser, but nothing further about the content of the men's conversation. Nevertheless, the prosecutor posed a series of carefully crafted questions to Mitrisin, which established the truth of the matter asserted, that is, Woolheater had spoken

about Lance Morningstar and Deb Huser, individuals whom Mitrisin otherwise did not know. Although the prosecutor prefaced his questions by saying "without telling me what Mr. Woolheater said," the questions indeed sought substantive information about Woolheater's out-of-court statements, specifically the identities of the people discussed. Although the prosecutor asked whether Woolheater had "ever" spoken about these individuals, the questions followed immediately on the heels of Mitrisin's description of Woolheater and Huser having a man-to-man discussion out of her earshot at Woolheater's Quonset hut. The unmistakable implication the prosecution wished to leave with the jury was that following his private conversation with the defendant, Woolheater told Mitrisin that they discussed Deb Huser and Morningstar. It would not take much imagination on the part of the jurors to fill in the blanks and speculate that the men's conversation cemented their plan to kill Morningstar.

"Backdoor hearsay" has been defined as "a form of question and answer that does not produce hearsay in the classic or textbook sense" but "nevertheless is designed to circumvent the hearsay rule and present the jury with information from unsworn, out-of-court sources." *See Schaffer v. State*, 721 S.W.2d 594, 597 (Tex. Ct. App. 1986). Another court was critical of the "artifice" of having a witness "supposedly restrict" his testimony to his "half of his conversation" with an out-of-court declarant, while indirectly introducing hearsay. *See, e.g.*, *United States v. Check*, 582 F.2d 668, 679 (2d Cir. 1978) (holding the questioner's "device" of admonishing witness "without telling me what the declarant told you" was "improper and cannot miraculously transform inadmissible hearsay into admissible evidence"). Our court cited *Check* when we preserved a claim of

ineffective assistance of counsel for failing to object to the prosecutor's attempt to "introduce hearsay evidence in a roundabout way." *State v. Farrar*, No. 10-1039, 2011 WL 3480999, at *1, *3 (Iowa Ct. App. Aug. 10, 2011). In *Farrar*, two members of the three-judge panel ruled that trial counsel should have an opportunity to explain why he or she did not object to the prosecutor's questions. *Id.* at *3. One judge specially concurred, opining the claim could be resolved on direct appeal because the challenged testimony was not hearsay. *Id.*

Following Mitrisin's testimony that Woolheater spoke of Vern Huser, Deb Huser and Morningstar—thus completing the triangle—the defense moved for a mistrial. The prosecutor insisted no hearsay had been offered and that his line of questioning was permissible under *Farrar*. The prosecutor badly misread *Farrar*, a case in which he was the trial prosecutor and engaged in the same type of questioning. The majority decision plainly did not endorse the practice and the special concurrence would not have been necessary had the *Farrar* majority held there was nothing objectionable about the testimony elicited by the prosecutor's questions. Moreover, the prosecutor circumvented the district court's directive on the admissibility of hearsay evidence. The district court generously decided the State violated only "the spirit of the court's motion in limine ruling," but cautioned the prosecutors that "future mishaps place the entire trial in jeopardy." The district court should have granted the mistrial, or at a minimum, struck the entirety of Mitrisin's testimony.[11] While prosecutors are properly vigorous

---

[11] I disagree with the majority's sentiments in footnote 4 that defense counsel had an obligation to "nip in the bud" whatever prejudice he now claims from Mitrisin's testimony. It was the State's obligation to abide by the court's ruling on the motion in limine. The State violated that ruling even in the absence of an objection. And the damage done

advocates for the State's position within the bounds of the law, their "primary interest should be to see that justice is done, not to obtain a conviction." *See State v. Graves*, 668 N.W.2d 860, 870 (Iowa 2003). Doing justice requires an accurate reading of case law, even if it is only persuasive authority, and requires adherence to the letter of the district court's rulings regarding the admissibility of evidence. That was not done in this instance.

As for Zwank's testimony, my concern centers on the good-for-the-goose, good-for-the-gander theory of admissibility. The district court suggested that permitting defense counsel to introduce Woolheater's statements concerning his independent motive to kill Morningstar would have "opened the door" to the State offering out-of-court statements determined to be inadmissible in the first appeal.[12] The principle of "opening the door" pertains to the ability of a party to rebut inadmissible evidence offered by an adversary. *State v. Parker*, 747 N.W.2d 196, 206 (Iowa 2008) (describing rule as "fighting fire with fire"). But the principle only applies to rebutting *inadmissible* evidence. *See* 1 Kenneth S. Broun, et al., *McCormick on Evidence* § 57, at 402–03 (7th ed. 2013) (describing rule of "curative admissibility" as applying when "[o]ne party successfully offers

---

was not clear until all three questions were asked. Defense counsel preserved error without raising an objection that would flag the hearsay testimony for the jurors. *See State v. Edgerly*, 571 N.W.2d 25, 29 (Iowa Ct. App. 1997) (when the court's ruling on motion in limine reaches ultimate issue of admissibility, objection need not be renewed at trial).

[12] As the majority notes, in the first appeal, the State only argued Woolheater's out-of-court statements to Mitrisin, Marie Connett, and Larry Webb conveying Huser's motive were admissible for the nonhearsay purpose of showing Woolheater's responsive conduct and his motive for being involved in Huser's plot to kill Morningstar. The State did not argue in the first appeal that Woolheater's statements to those three individuals were admissible as statements against interest or as coconspirator statements. In the second trial, the State did not pursue an appellate challenge to the district court's ruling that the exclusion of those hearsay statements was the "law of the case."

inadmissible evidence. . . . The evidence might come in because the adversary neglects to object, he has no opportunity to object, or the judge erroneously overrules an objection.").

In this case, Woolheater's statements to Zwank that Morningstar had something against him and that information could send Woolheater back to jail were admissible as statements against interest. *See* Iowa R. Evid. 5.804(b)(3).[13] Contrary to the majority's view, I believe sufficient corroborating circumstances existed to indicate the trustworthiness of Woolheater's out-of-court statements to Zwank. Our supreme court has not adopted "a hard and fast rule regarding corroboration." *See State v. Paredes*, 775 N.W.2d 554, 568 (Iowa 2009). But if a nexus exists between the declarant and the time and place of the crime and the statement has "substantial plausibility," the proponent has met the corroboration requirement. *Id.* Woolheater's involvement in the killing was extensively corroborated, and his statements revealing that involvement to Zwank were against his penal interest regardless whether the motive was his own or sparked by Huser's jealousy. It is not clear that Woolheater's statements regarding his motive required separate corroboration. But even if they did, I see nothing in the record to suggest Woolheater would be covering for Huser when explaining to Zwank why he needed help moving the body. Zwank testified she did not know Huser when she was dating Woolheater. Moreover, Woolheater and Huser did not have the kind of close relationship where Woolheater would have cause to inculpate himself and exculpate Huser. *See Paredes*, 775 N.W.2d at 567 (citing *United States v. Paulino*, 445 F.3d 211, 219-20 (2nd Cir. 2006) (finding

---

[13] The parties do not dispute that Woolheater was unavailable.

insufficient corroboration where father tried to take responsibility for drugs to protect his son).  I believe Huser met the test for corroborating Zwank's testimony concerning Woolheater's independent motive for the murder.  *See People v. Barrera*, 547 N.W.2d 280, 291 (Mich. 1996) (reasoning "the more crucial the statement is to the defendant's theory of defense, the less corroboration a court may constitutionally require for its admission").  Because the statements to Zwank were admissible, they should not have been viewed as "opening the door" to hearsay evidence previously excluded from the State's case.

Based on these two issues, I would remand for a new trial.