# IN THE COURT OF APPEALS OF IOWA

No. 16-0709
Filed December 20, 2017

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**RICHARD GENE SHAWHAN,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Jeanie K. Vaudt, Judge.

Richard Gene Shawhan appeals from his conviction for second-degree murder. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Considered by Danilson, C.J., and Tabor and McDonald, JJ.

**DANILSON, Chief Judge.**

Following a jury trial, Richard Gene Shawhan was convicted of second-degree murder for the death of Jeffrey Butts, who suffered brain trauma and eventual death after being hit three times in the head with a blunt instrument. On appeal, Shawhan contends the trial court abused its discretion in not allowing him to impeach a witness with a prior incident of untruthfulness, erred in instructing the jury, and did not apply the correct standard in ruling on his motion for new trial. In a supplemental pro se brief, Shawhan asserts counsel was ineffective in failing to object to additional instructional errors. Finding no reason to overturn the conviction, we affirm.

**I. Background Facts.**

On December 21, 2014, Shawhan did not return to the Fort Des Moines residential correctional facility. At that time, Butts and Kimberly Goemaat-Clark (Clark) were living together in an apartment and were allowing Brian Mabrier and Nicole Martin to stay with them. While on escape status, Shawhan occasionally stayed with Butts and Clark.

On December 26, Butts, Clark, Mabrier, and Martin returned to the apartment after having all been at "Junebug's" (the nickname of an acquaintance who was a mechanic). Mabrier and Martin were in one vehicle. Butts and Clark were in another, and they had picked up Shawhan, who called and asked for a ride. Shawhan showered at the Butts/Clark apartment and was given clothes to wear belonging to Butts. The five ate dinner together and spent the rest of the evening "hanging out," playing darts, and using methamphetamine. At some point, Thomas Beall was also present but left. Butts and Clark left for a time.

Shawhan became increasingly paranoid as time passed. He took Mabrier's dog outside. He reported to Mabrier he was seeing police officers and dogs in the trees. Shawhan saw a baseball bat in Martin's vehicle and asked Mabrier if he could have it for protection. Mabrier gave Shawhan the bat.

At about 5:30 a.m. on December 27, Butts and Clark returned to the apartment. They were on the bed, which was located in the main room of the apartment. Mabrier and Martin were in the spare room, and Shawhan was pacing between the two rooms "back and forth throughout the night," still carrying the baseball bat. Clark dozed off. She was awakened by a loud noise (a "ping" she recognized as the sound of an aluminum bat) and saw Shawhan holding a bat aloft and standing over her and Butts. Martin heard Clark screaming, "Don't do that. Why did you do that?" Shawhan yelled, "You should have killed me when you had the chance, motherfucker." Mabrier saw Shawhan come into the spare room holding the bat and having a "crazy look on his face." Mabrier jumped out the second-story window.

Shawhan demanded that Martin give him a ride. When Martin came out of the spare room, she saw Butts on the bed, "laying there with his hands wrapped up over his face and rocking back and forth . . . . gurgling." She and Shawhan encountered Mabrier outside on the stairs to the apartment building. Mabrier tried to convince Martin not to go with Shawhan; Martin said, "I'm just going to get him out of here so he don't hurt nobody else." Shawhan said to Mabrier, "I wasn't even going to hurt you." Clark then came out onto the balcony of the apartment and yelled to Mabrier, "Help me, help me. He hit him in the head with a ball bat. He hit him in the head with the ball bat." The front security door to the

building was locked, so Mabrier climbed onto the deck and returned to the apartment as Martin and Shawhan drove away.

Mabrier and Clark tried to carry Butts out of the apartment to take him to the hospital. Butts (who was much larger than Mabrier) was struggling and was on the ground near the bottom of the steps when an ambulance arrived, having been summoned by neighbors' calls to 911.

Officer Patrick Hickey was one of the first to respond to the 911 call to the Butts/Clark apartment. Clark told Officer Hickey she was sitting on the bed and Butts was there on the bed with her. She stated "Ricky"—she did not know him by Shawhan—was sitting at the end of the bed in a red chair. She was not paying attention to either of them when she heard what she said sounded like two or three pings like somebody getting hit on the head with a baseball bat. When she turned around, she saw Butts was bleeding a lot.

Marbier told Officer Hickey he was not in the apartment at the time of the assault. "He said that he had left prior to the assault with their dog and walked through the living room, which is [also] a bedroom where he saw both Clark [and] Butts on the bed and Shawhan sitting in the chair."

In the meantime, Shawhan was directing Martin to drive to the apartment of a friend but he could not remember the unit, then to his sister's house but she was not home, and then to his girlfriend's house. There, Shawhan's girlfriend got in the vehicle with Martin and Shawhan, who was lying on the floor in the back seat of the van. They went to the gas station because the van was running out of gas. Martin took money inside to pay for gas, told an attendant she was being held against her will, and then locked herself in the bathroom and called 911.

When officers arrived at the gas station and surrounded the van, Shawhan was lying on the floor and had a baseball bat next to his left hand. He surrendered without incident.

Butts's speech was not coherent when he arrived at the hospital. Because of the seriousness of his injuries, he was taken to University of Iowa Hospitals. He sustained a skull fracture, intracranial bleeding, and facial bone fractures.

Both Clark and Mabrier gave additional statements to police. While in the interview room at the police station, Mabrier ripped off his shirt, which was covered in Butts's blood, and attempted to hide it in the ceiling. Detective Danny White confronted Mabrier about his attempt to hide his clothes. Mabrier stated he did not want to be a "snitch." During the interview, Mabrier was "sobbing and you could tell that he was highly upset about what had occurred."

Butts was taken off of life support and died on January 4, 2015. Shawhan was charged with first-degree murder.

The State filed a motion in limine seeking to exclude any reference to an incident when Officer Hickey had not been truthful during an internal affairs investigation. After a hearing, the district court ruled:

> [I]t's legitimate for [the defense] to ask if he has ever had any issues regarding his propensity for truthfulness or however they want to cast that, you know what the rule says in terms of what the buzz words are, regarding the assignment of his job duties.
>     And by that I mean [the prosecutor] has indicated he's been a professional in law enforcement for a lot of years. If he has something in his background related to the assignment of whatever he was tasked to do as an officer of some kind for Des Moines PD, I think that's fair game. I do not think the internal affairs investigation is fair game because in the Court's view—and I understand why the defense wants to get at this because, in fact, if

there is something related to what he was assigned to do, he was assigned to do something here. So for me that's the link between the two.

In a subsequent offer of proof, Officer Hickey testified that about four years prior, a fellow officer had discharged his firearm inside a building belonging to the police department. During the resulting internal affairs investigation, Officer Hickey corroborated the fellow officer's statement that the other officer had not been responsible for the firearm discharge. However, after the fellow officer admitted he had accidentally discharged the weapon, Officer Hickey changed his own statement. As a consequence of the rule violation, Officer Hickey was suspended for seventeen days, removed from the Metro SWAT team and as the team leader of another team, and "sent back to day patrol."

The court made a further ruling:

> I think that Officer Hickey can be asked if he ever had any issues with truthfulness regarding the work that he was assigned to do in however many positions he's held with the Des Moines Police Department.
> That does not include this internal investigation or delving into this internal investigation that was at least three or four years ago for the following reason: His ability to be truthful or not, if it related to something arising from an investigation or if it arose from him completing a report when he was out on the beat and was dispatched somewhere and he had to take information similar to what his role was here, if that was the situation, I would agree that that would be fair game.
> It may—and so now let's step back for a second and talk about the internal investigation. On some level it may have some minimal relevance, but the court doesn't think that whatever relevance it could have, however tangential that might be, I don't think it—it's relevant enough that it qualifies to be delved into here. And I think as well that offering that information could potentially be unfairly prejudicial.
> So on that basis, I want to make sure the parties both understand. And if you don't, now's the time to say so. You can chat with Officer Hickey. You heard what he would be prepared to say. You can ask him if he ever had any issues regarding his

assigned duties; in other words, when he was out there performing whatever task he was assigned to perform as a cop in whatever capacity he was performing that in, because my understanding is that he has been an employee of the Des Moines Police Department for a number of years. So you're free to ask him, and whatever he says is what he says.

Clark, Mabrier, and Martin were among the witnesses who testified at trial. Another of the witnesses, Frank Nucaro, acknowledged that he had known Shawhan as a kid growing up and that they both ended up in the Polk County Jail in late December 2014. Nucaro stated Shawhan told him Shawhan had gotten into a verbal altercation with Butts and that he showed Butts that he "wasn't a tough guy" by hitting Butts with a baseball bat. Nucaro also stated Shawhan asked him to make sure the witnesses "didn't make it" and were "taken care of" if Nucaro was successful in bonding out. Nucaro was eventually transferred to the state prison at Oakdale and contacted authorities with the information Shawhan had shared with him. Nucaro stated he did so because he was concerned for the welfare of Martin, who he knew was pregnant.

The State played a number of recorded phone conversations Shawhan had while at the Polk County Jail. In some of the calls, Shawhan refers to wanting "Mike J." to talk to people who had been in the apartment.

Shawhan testified that in the early morning hours of December 27, he was outside walking the dog due to his paranoia. Shawhan stated he came through the front door of the building and had just entered the Butts/Clark apartment when he heard Clark screaming and saw a person go into the spare room. Shawhan stated he did not see who hit Butts or what he was hit with.

The jury found Shawhan guilty of second-degree murder. He now appeals.

**II. Scope and Standards of Review.**

We generally review the trial court's evidentiary rulings for an abuse of discretion. *State v. Tipton*, 897 N.W.2d 653, 690 (Iowa 2017). Even if the trial court has abused its discretion in excluding evidence, we do not reverse for a new trial unless the exclusion was prejudicial. *State v. Greene*, 592 N.W.2d 24, 27 (Iowa 1999).

"Alleged errors in the submission or refusal to submit jury instructions are reviewed for correction of errors at law." *Tipton*, 897 N.W.2d at 694. "[H]owever, if the jury instruction is not required but discretionary, we review for an abuse of discretion." *State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017). "We review jury instructions as a whole to determine whether the jury instructions correctly state the law." *Tipton*, 897 N.W.2d at 694.

We review claims of ineffective assistance of counsel de novo because such claims raise constitutional issues. *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001).

**III. Discussion.**

*A. Limitations on impeachment of Officer Hickey.* Shawhan notes Officer Hickey was one of two responding officers in the case. Officer Hickey took the initial statements from Clark and Mabrier, who later gave different statements at trial. Officer Hickey acknowledged not securing the scene initially, which resulted

in maintenance workers for the complex having started to clean blood from the common areas of the building before police returned to secure the area.[1]

Shawhan asserts the trial court abused its discretion in prohibiting Shawhan from impeaching Officer Hickey with evidence regarding his prior discipline for untruthfulness, contending the evidence was relevant to Officer Hickey's general credibility. He argues the failure to permit impeachment harmed Shawhan's case:

> [T]he court's refusal to permit the general impeachment of Hickey left a false impression for the jury. At the beginning of his testimony, Hickey informed the jury that he was a patrol officer who had also been on the vice and narcotics and SWAT teams. He said he had been the leader of the Weapons of Mass Destruction team, the dive master of the dive team, and an assistant leader for the entry team. This experience probably sounds fairly impressive to the average juror, who might then credit Hickey with a certain degree of respect and credibility. Had jurors heard that Hickey was removed from those special teams based on being disciplined for untruthfulness in an internal affairs investigation, they might have viewed his credibility much differently.

Under Iowa Rule of Evidence 5.608(b), in its discretion, the court may permit inquiry into specific instances of conduct on cross-examination if the evidence is probative of a witness's character for truthfulness or untruthfulness. *State v. Knox*, 536 N.W.2d 735, 740 (Iowa 1995). The trial court considers the probative value of the evidence, *State v. Smith*, 522 N.W.2d 591, 593 (Iowa 1994), and whether the probative value is outweighed by the danger of unfair prejudice, *Knox*, 536 N.W.2d at 740. We will disturb the trial court's ruling "only

---

[1] Officer Hickey testified that the initial call was for an assault and "we didn't have a victim because he didn't want to file a report." When the prosecutor noted that Officer Hickey had testified Butts could not talk, the officer testified: "That is correct. When I asked, he didn't answer, so I can't assume that he wanted one. So I just went ahead and made the injured person's report."

when its discretion has been obviously abused." *State v. Frazier*, 559 N.W.2d 34, 38 (Iowa Ct. App. 1996). "An abuse of discretion will be found when the court exercises its discretion on grounds clearly untenable or to an extent clearly unreasonable." *Id.*

Here, the trial court weighed the probative value ("minimal relevance") of the evidence and concluded it was "unfairly prejudicial." While another court might come to different result, these grounds are not clearly untenable or clearly unreasonable. We thus conclude the trial court did not abuse its discretion.

Even if we would determine the trial court abused its discretion, we could not conclude the exclusion of the evidence was prejudicial affording Shawhan a new trial. Officer Hickey was one of several investigating officers that testified and was not an eyewitness to the crime. His testimony was not indispensable to the State's case as other officers testified to some of the same facts. Photo evidence was also admitted relative to some of Officer Hickey's testimony. There was no prejudice to Shawhan by the exclusion of the evidence.

*B. The bad-acts jury instruction.* The trial court provided the following proposed jury instruction:[2]

> You have received evidence and heard testimony that the defendant may have committed certain illegal acts which are not charged in the trial information in this case. The defendant is not on trial for those acts.
> Evidence of other crimes, wrongs, or acts may not be used by you to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, common sense, opportunity, preparation, plan, knowledge, identity of person charged, or absence of mistake or accident.

---

[2] Instruction No. 18.

Shawhan, however, requested the model instruction for other-bad-acts evidence found in Iowa Criminal Jury Instruction 200.34:

> Evidence has been received concerning other wrongful acts alleged to have been committed by the defendant. The defendant is not on trial for those acts. This evidence must be shown by clear proof to show [motive] [intent] [absence of mistake or accident] [common scheme] [identity of person charged] and for no other purpose. If you find other wrongful acts occurred then and only then may such other wrongful acts be considered for the purpose of establishing [motive] [intent] [absence of mistake or accident] [common scheme] [identity of person charged].
> You may consider whether the acts were recent or remote and whether the acts were similar or dissimilar to the crimes charged in this case and all other relevant factors in deciding how much weight and effect to give them.

Shawhan asserts the court's instruction "omitted any reference to the State's burden to provide clear proof of the other bad acts"; "omitted the direction that the jury could use the evidence of other bad acts for specific purposes *only if* the jury found the other acts occurred"; referred to "illegal acts" as opposed to "wrongful acts"; "essentially convey[ed] to the jury that Shawhan had, in fact, committed other illegal acts"; and that the given instruction would have confused the jury because it improperly allowed the jury to use the evidence as substantive evidence of motive, intent, and identity.

The instruction requested by Shawhan and his claims of error are premised upon Iowa Rule of Evidence 5.404(b)[3] and case law concerning the

---

[3] Rule 5.404(b) provides:
*Crimes, wrongs, or other acts.*
　　(1) *Prohibited use.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in in accordance with the character.
　　(2) *Permitted uses.* This evidence may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

rule. *See, e.g.*, *State v. Putman*, 848 N.W.2d 1, 8-9 (Iowa 2014) (discussing the "three-step analysis" in determining whether to admit prior-bad-acts evidence).[4]

The State claimed evidence of bad acts was presented solely to complete the story and was inextricably intertwined evidence, and supported the court's proposed jury instruction. The State argued that because the prior-bad-acts evidence was inextricably intertwined to the story, rule 5.404(b) was inapplicable.

"Inextricably intertwined evidence is evidence of the surrounding circumstances of the crime in a causal, temporal, or spatial sense, incidentally revealing additional, but uncharged, criminal activity." *State v. Nelson*, 791 N.W.2d 414, 420 (Iowa 2010) (citation omitted). Our supreme court discussed the inextricably intertwined doctrine in *Nelson*, stating:

> The inextricably intertwined doctrine bypasses rule 5.404(b) because rule 5.404(b), by its express terms, is only applicable to evidence of *other* crimes, wrongs, or acts, which is considered to be extrinsic evidence. Edward J. Imwinkelried, *The Second Coming of Res Gestae: A Procedural Approach to Untangling the "Inextricably Intertwined" Theory for Admitting Evidence of an Accused's Uncharged Misconduct*, 59 Cath. U.L. Rev. 719, 724-25 (2010).
> . . . [B]ecause rule 5.404(b) is inapplicable to inextricably intertwined evidence, the court admits the technically uncharged-crime evidence *without limitation and irrespective of its unfair prejudice or its bearing on the defendant's bad character*. Instead, the inextricably intertwined evidence is subject to the same general admissibility requirements as other evidence that is used to provide the fact finder with a complete picture of the charged crime.
> In summary, the inextricably intertwined doctrine permits the admission of other crimes, wrongs, or acts evidence based on a special relationship between this evidence and the charged crime, *regardless of the strictures of rule 5.404(b).*

---

[4] "If the evidence is [1] relevant to a legitimate and disputed factual issue, and [2] the clear-proof requirement is satisfied, [3] the court must determine whether the evidence's 'probative value is substantially outweighed by the danger of unfair prejudice to the defendant.'" *Putman*, 848 N.W.2d at 9 (citation omitted).

*Id.* at 420 (emphasis added) (citations omitted).  The *Nelson* court observed,

> Although Iowa has never referred to other crimes, wrongs, or acts evidence as inextricably intertwined, we have long recognized the rule that, "[w]hen acts are so closely related in time and place and so intimately connected that they form a continuous transaction, the whole transaction may be shown *to complete the story of what happened* [even though they may incidentally show the commission of another uncharged crime]."

*Id.* at 422 (alteration in original) (citation omitted).  The court adopted the doctrine but concluded it should be "used infrequently and as a narrow exception."  *Id.* at 423.

> To ensure a court does not admit unnecessary and prejudicial evidence of other crimes, wrongs, or acts, we reaffirm the language from one of our earlier cases and hold we will only allow such evidence to complete the story of what happened when the other crimes, wrongs, or acts evidence is so closely related in time and place and so intimately connected to the crime charged that it forms a continuous transaction.  [*State v.*] *Oppelt*, 329 N.W.2d [17,] 19 [(Iowa 1983)].  Thus, the charged and uncharged crimes, wrongs, or acts must form a continuous transaction.  *Id.* Moreover, we will only allow the admission of other crimes, wrongs, or acts evidence to complete the story of the charged crime when a court cannot sever this evidence from the narrative of the charged crime without leaving the narrative unintelligible, incomprehensible, confusing, or misleading.  In this way, we can be sure rule 5.404(b) remains the standard for the admission of evidence of other crimes, wrongs, or acts *and the inextricably intertwined doctrine is construed as a narrow and limited exception to rule 5.404(b).*

*Id.* at 423-24 (emphasis added).

Shawhan does not dispute that evidence of his absence from Fort Des Moines, drug use at the apartment, and the manner in which Martin left the apartment with Shawhan was inextricably intertwined with the story of the assault.  Consequently, rule 5.404(b) is not applicable.  *See id.* at 420, 424.  This conclusion, however, does not completely resolve Shawhan's complaint because

the court ultimately instructed the jury as provided in its Proposed Instruction No. 18.[5]

Shawhan also complains the court's instruction "specifically told the jury Shawhan's illegal acts could be considered for any one of the listed purposes [motive, intent, identity]." He asserts this is impermissible under *Nelson*. If the evidence presented by the State was for the sole purpose to complete the story and was inextricably intertwined evidence, then the jury should not have been instructed that it could use the evidence for one of the listed purposes identified in the jury instruction used by the court. If the State intended to use the evidence for one of the listed purposes, then Shawhan's instruction correctly identified the State's burden and the process the jury was to consider in its deliberations.

The problem with Shawhan's argument here is that Shawhan has not identified any testimony or argument where the State attempted to show or argue the inextricably-intertwined evidence of bad acts was proof of or should be used by the jury to infer any of the identified purposes in the instruction. We will not comb the record for facts to support an argument. *Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996). Instead, Shawhan only speculates that the jury could have used the inextricably-intertwined evidence of bad acts for one of those purposes. Because we are unable to conclude the State relied upon any bad acts to prove any of the identified purposes or, for that matter, any other purpose than to complete the story, the second paragraph of Instruction No. 17 was more akin to being superfluous than erroneous—it properly recited the language in rule

---

[5] See above at page ten.

5.404(b). *See State v. Thorndike*, 860 N.W.2d 316, 322 (Iowa 2015) (finding defendant did not suffer prejudice from superfluous alternative in instruction).

Nonetheless, we believe it is also prudent to examine this issue as a refusal to give a requested instruction. Certainly, Shawhan submitted a requested instruction that was more complete in describing the law than did Instruction No. 17. Here, Shawhan has not contended there was a violation of the constitution. In *Plain*, our supreme court stated,

> "When the error is not of constitutional magnitude, the test of prejudice is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice." "We [do] not reverse for marginal or technical omissions . . . ."

898 N.W.2d at 817 (alteration in original) (citations omitted).

But even if the refusal to instruct as Shawhan requested was an error at law, we are unable to conclude Shawhan was prejudiced by the use of the instruction on bad acts. As we have previously noted, Shawhan cannot point to any evidence or argument where the State relied upon the bad acts to prove anything other than to complete the story. Moreover, there was strong evidence of Shawhan's guilt.

Shawhan also argues he was prejudiced by the court's instruction because it used "illegal acts" rather than "wrongful acts." He asserts, "[T]he court was essentially conveying to the jury that Shawhan had, in fact, committed other illegal acts." "Error in jury instructions is reversible only if the error is prejudicial." *State v. Ambrose*, 861 N.W.2d 550, 554 (Iowa 2015) (citation omitted). We are hard pressed to conclude the use of the term "illegal acts" was prejudicial where

Shawhan admitted he absconded from a correctional facility and used methamphetamine and other controlled substances.

*C. Standard used to rule upon the motion for new trial.* Shawhan next asserts the trial court used the wrong standard to rule on his motion for new trial, i.e., the sufficiency of the evidence rather than the weight of the evidence. The record belies that claim, and we do not address it further.

*D. Ineffective assistance of counsel.* In a supplemental pro se brief, Shawhan asserts his trial counsel was ineffective in failing to object to additional jury instructions—those setting out the elements of assault, defining a "dangerous weapon," and causation.[6]

There is a strong presumption that trial counsel performed competently. *State v. Graves*, 668 N.W.2d 860, 881 (Iowa 2003). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

Where an erroneous-instruction claim is raised on direct appeal in the context of an ineffective-assistance-of-counsel claim, we must decide whether it can be determined as a matter of law that Shawhan's counsel failed in an essential duty and Shawhan was prejudiced as a result. *See State v. Fountain*, 786 N.W.2d 260, 263 (Iowa 2010). The defendant must demonstrate both a

---

[6] Shawhan refers to Instruction No. 27 as the "wounds-inflicted" instruction. Instruction No. 27 provides:

The act of hitting a person with a baseball bat results in the death of that person if those actions caused or directly contributed to that person's death.

breach of duty and prejudice by a preponderance of the evidence. *Ledezma*, 626 N.W.2d at 142. We also note, "Counsel has no duty to raise an issue that has no merit." *Fountain*, 786 N.W.2d at 263. Moreover, "[i]f the claim lacks prejudice, it can be decided on that ground alone without deciding whether the attorney performed deficiently." *Ledezma*, 626 N.W.2d at 142.

*1. Assault instruction.* "[T]he crime of assault includes a specific intent element." *Fountain*, 786 N.W.2d at 265. Shawhan contends the assault jury instruction given by the trial court did not require a finding of specific intent. Here, the court instructed the jury:

> An assault is committed when a person does an act which is meant to:
>     1. Cause pain or injury to another person; or
>     2. Result in physical contact which will be insulting or offensive to another person; or
>     3. Place another person in fear of immediate physical contact which will be painful, injurious, insulting or offensive to the other person, when coupled with apparent ability to do the act.

The jury was also given an instruction on specific intent.[7]

In *State v. Pendleton*, this court found such "meant to" language in an assault instruction "used plain language to explain the intent required for assault." No. 13-1647, 2014 WL 6977188, at *5 (Iowa Ct. App. Dec. 10, 2014); *accord State v. Clark*, No. 14-2035, 2016 WL 1130286, at *6 (Iowa Ct. App. Mar. 23,

---

[7] Instruction No. 20 provided:

> "Specific intent" means not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind.
> Because determining the defendant's specific intent requires you to decide what he was thinking when an act was done, it is seldom capable of direct proof. Therefore, you should consider the facts and circumstances surrounding the act to determine the defendant's specific intent. You may, but are not required to, conclude a person intends the natural results of his acts.

2016). We find these cases persuasive and conclude counsel was not required to object to the instruction given.

*2. Dangerous weapon instruction.* The jury here was instructed that "[m]alice aforethought may be inferred from a defendant's use of a dangerous weapon."[8] The following instruction defined a dangerous weapon:[9]

> A "dangerous weapon" is any device or instrument designed primarily for use in inflicting death or injury, and when used in its designed manner is capable of inflicting death. It is also any sort of instrument or device which is actually used in such a way as to indicate the user intended to inflict death or serious injury, and when so used is capable of inflicting death.

Shawhan asserts trial counsel was ineffective in failing to object to the inclusion of the first sentence of the instruction and to argue a baseball bat was not a dangerous weapon thereunder. As to this assertion, we conclude Shawhan cannot establish he was prejudiced by the superfluous language of the instruction. *See Thorndike*, 860 N.W.2d at 322.

*3. Causation.* Finally, Shawhan argues Instruction No. 27 allowed the jury to find him guilty if "a person"—not necessarily Butts—was hit with a baseball bat resulting in death. This instruction supplements Instructions No. 24 and No. 34, however, which contain the elements of the offenses of first-degree and second-degree murder. Each required the State to prove "the defendant assaulted Jeffrey Butts with a baseball bat." Read as a whole, the jury was adequately informed of the elements of the offenses and that it was the defendant that must have caused Butts's death. *See Plain*, 898 N.W.2d at 838

---

[8] Instruction No. 29.
[9] Instruction No. 30.

(Waterman, J., concurring specially) ("Iowa jury instructions are to be read as a whole.").

**AFFIRMED.**